# COURT OF APPEAL FOR ONTARIO

CITATION: United States v. Cavan, 2015 ONCA 664

DATE: 20151002

DOCKET: C58169

Watt, Pepall and Huscroft JJ.A.

IN THE MATTER OF an application for judicial review pursuant to s. 57 of the *Extradition Act*, S.C. 1999, c. 18

BETWEEN

The Minister of Justice and Attorney General of Canada and

The United States of America

Respondents

and

Han Cavan

Applicant

John Norris and Meara Conway, for the applicant

Nancy Dennison, for the respondents

Heard: January 30, 2015

On application for judicial review of the surrender order of the Minister of Justice, dated December 12, 2013.

**Watt J.A.:**

[1]     Those who persist in their pursuits have mixed results. Some succeed. Others fail.

[2]     Han Cavan persisted in his pursuit of cocaine in the United States for sale in Canada. Twice he tried. And twice he failed. The reasons he failed differed. But the result was the same. No drugs. And no money.

[3]     Han Cavan's troubles were not over. United States authorities wanted to prosecute him for his alleged involvement in those failed drug transactions. And they wanted Canada's help to pursue the prosecution by returning Cavan to the United States for trial.

[4]    Han Cavan agreed that the United States authorities had made out a case for his committal for surrender. A judge ordered his committal. The Minister of Justice ordered Cavan's surrender.

[5]    Han Cavan does not contest the committal order. But he contends that the surrender order is fatally flawed by legal errors the Minister made in his decision. These reasons explain why I have concluded that, in this pursuit, Han Cavan fails again.

## THE BACKGROUND FACTS

[6]    A brief tour through the nature of the allegations and the history of the proceedings is essential to an understanding of the claims of error advanced here.

### The Original Conviction

[7]    The story begins in Minneapolis, Minnesota, on November 20, 2006, when Han Cavan was sentenced to imprisonment for 8 years, 8 months and 8 days on a conviction for conspiracy to traffic in nearly 30,000 ecstasy pills.

[8]    Han Cavan is a Canadian citizen. When convicted and sentenced in Minneapolis, Cavan was living and had a business in the United States. He began serving his sentence in a U.S. prison.

### The Transfer to Canada

[9]    On May 9, 2008, under the *International Transfer of Offenders Act*, S.C. 2004, c. 21 and governing treaty, Cavan became a treaty transfer case to Canada. He arrived in Canada on June 26, 2008 to serve the remainder of his sentence.

### Accelerated Day Parole

[10]    About six weeks after his return to Canada, Han Cavan was granted accelerated day parole. He was to reside at a Salvation Army residence in Kitchener while subject to the conditions of his day parole.

### The First Plan

[11]    United States authorities allege that, during the summer of 2008, Han Cavan telephoned an individual in the United States in search of kilogram quantities of cocaine. The person whom Cavan called was a brother of a man with whom Cavan had been in jail in the United States. Unknown to Cavan, however, the man was also a paid confidential source who worked with the Drug Enforcement Agency ("the DEA").

[12]    The communications between Cavan and the DEA source continued into the fall of

2008 and included visits to New York City by Jo Van Lo, one of Cavan's associates, to settle the details of the transaction: 17 kilograms of cocaine for $27,000 per kilogram. The money, about $458,000, was to be transported to the United States in a secret compartment in a sports utility vehicle and exchanged for the cocaine, which was to be transported back to Canada in the same compartment of the same vehicle.

[13]   The plan failed. Customs and Border Protection agents stopped the vehicle at the Peace Bridge, searched it and found $458,000 in the hidden compartment. The driver of the vehicle, William Hicks, explained the scheme in a post-arrest statement to United States authorities.

## Accelerated Full Parole

[14]   On October 2, 2009 the Parole Board of Canada ("PBC") granted Han Cavan accelerated full parole. He was required to live at a designated address in Kitchener and be supervised by the Guelph Parole Office.

## The Second Plan

[15]   According to United States authorities, Cavan continued to call the DEA source about the purchase of kilogram amounts of cocaine in 2009. The parties settled on a proposed exchange of 10 kilograms of cocaine for $25,000 per kilogram. Delivery of the drugs to Cavan's associate, John Mawhinney, did not proceed in accordance with the original plan. A new plan was formulated. The transfer was to take place in Tonawanda, New York.

[16]   In Tonawanda, Mawhinney was given a sample of the cocaine by an undercover law enforcement agent. Mawhinney then produced a duffle bag containing the purchase price and a transportation fee of $500 per kilogram. When Mawhinney turned over the money to the DEA source, DEA agents arrested Mawhinney.

## The United States Indictment

[17]   On November 19, 2009, two days after Mawhinney was arrested in Tonawanda, New York, a Grand Jury in the Southern District of New York returned a true bill of indictment against Mawhinney, Adam Kaup (who was with Mawhinney in Tonawanda), Cavan, Lo and Hicks.

[18]   The indictment alleged a conspiracy from at least November 2008 until November 17, 2009 to distribute and to possess with intent to distribute cocaine. Arrest warrants were issued the same day.

## Suspension and Revocation of Parole

[19]   Within a week of the Grand Jury indictment, a warrant suspending Cavan's parole was

issued. The warrant was executed the next day when Cavan attended a scheduled supervision interview.

[20]  About two and one-half months after Cavan's parole was suspended, the PBC revoked his parole on the basis that he was involved in the commission of a new criminal offence and had breached a specific non-association condition of his parole. Cavan was recommitted to custody with a warrant expiry date of July 27, 2015. He has not taken any steps to review the suspension or cancellation of his parole.

[21]  The only new criminal involvement described in the materials provided to parole authorities was the charges contained in the U.S. indictment.

## The Extradition Request

[22]  By diplomatic note on September 14, 2012 the United States requested the extradition of Cavan, Lo and Hicks to stand trial on the indictment in the United States District Court for the Southern District of New York.

## The Authority to Proceed

[23]  About three months later, on December 13, 2012, counsel with the International Assistance Group issued an Authority to Proceed under s. 15 of the *Extradition Act*, S.C. 1999, c. 18 ("the Act"). The Attorney General of Canada was authorized to proceed before the Superior Court of Justice and seek orders of committal for Cavan, Lo and Hicks. The corresponding Canadian offence listed in the Authority to Proceed is conspiracy to traffic in a Schedule I controlled substance.

## The Arrest of Han Cavan

[24]  Han Cavan was arrested on March 1, 2013, about three years after his parole had been revoked and about 28 months before his warrant expiry date. The arrest occurred about three years and four months after the Grand Jury returned a true bill of indictment in the Southern District of New York.

## The Committal Hearing

[25]  On June 7, 2013 Han Cavan consented to his committal for surrender to United States authorities. A judge of the Superior Court of Justice ordered his committal.

## The Surrender Proceedings

[26]  Counsel for Han Cavan sought and obtained further information from officials in the International Assistance Group in order to make submissions to the Minister about surrender.

[27] On December 12, 2013 the Minister informed counsel for Cavan that he (the Minister) was ordering Cavan's surrender for extradition to the United States.

## THE GROUNDS FOR REVIEW

[28] Han Cavan invokes s. 57(1) of the *Extradition Act* to seek judicial review of the surrender order made by the Minister. He contends that the surrender order is unsupportable because the Minister made several errors in failing to find that surrender would not infringe Cavan's s. 7 *Charter* rights or would not be unjust or oppressive under s. 44(1)(a) of the *Extradition Act*.

[29] I would reframe these alleged errors as follows:

    i. The Minister erred in law by applying the wrong test and confining abuse of process to cases of bad faith and improper motive and thereby imposing an erroneously high standard on the exercise of his discretion to refuse to order surrender;

    ii. by limiting prejudice to the impact of delay on the extradition hearing; and

    iii. by unfairly imposing a burden on the applicant to show that an earlier extradition request would have resulted in his earlier release from custody.

[30] I will consider each component of the overarching submission of unreasonableness separately.

## Ground #1: The Abuse of Process Argument

[31] The first complaint advanced by Cavan is that the Minister applied the wrong test and imposed too rigorous a standard in responding to the submission that to surrender him (Cavan) would constitute an abuse of process.

[32] To determine the validity of this complaint, it is helpful to begin with a reference to the Minister's reasons on the issue before reviewing the positions of the parties and the principles that govern our decision on this issue.

### The Reasons of the Minister

[33] The Minister characterized this submission of counsel as an argument that surrender would be "unjust and oppressive" within s. 44 of the Act and an unjustifiable infringement of the applicant's s. 7 *Charter* rights. After noting that the arguments about delay by foreign authorities were analyzed as claims of abuse of process, the Minister described his understanding of the applicant's burden to establish an abuse of process in these terms:

> To find an abuse of process, there must be evidence of bad faith or improper motive on the part of the foreign authorities. As stated by the Supreme Court of Canada,

such a finding will be "extremely rare" and must only be made in the "clearest of cases" (*United States of America v. Cobb*, [2001] 1 SCR 587; *R. v. Power*, supra). Additionally, it must be shown that the delay resulted in actual prejudice of such magnitude that the public's sense of decency and fairness is affected (*Blencoe v. British Columbia (Human Rights Commission)*, [2000] 2 SCR 307).

[34] After a brief recital of the events that occurred from the Grand Jury indictment of the applicant and the others until the making of the extradition request the Minister wrote:

> Your submissions are to the effect that the delay caused Mr. Cavan to be re-incarcerated for at least three years as a result of his parole having been suspended and revoked by order of the Parole Board of Canada (PBC). However, you have not presented any evidence to suggest that the U.S. authorities were involved in the parole suspension or revocation proceedings in Canada, other than to provide information to Canadian authorities. In particular, your materials indicate that the DEA provided information to Canadian officials concerning Mr. Cavan's alleged involvement in cocaine trafficking while on parole. The U.S. authorities also provided updates at the request of Canadian officials on the status of their extradition request.

> Your materials reveal that Mr. Cavan's parole was not only revoked by the PBC because of information suggesting his involvement in drug trafficking but also because he violated a condition of his parole not to associate with a certain individual or individuals. Moreover, the delay in seeking Mr. Cavan's extradition did not bring about the parole suspension; it was Mr. Cavan's alleged conduct itself.

[35] After a brief reference to the conduct of Canadian authorities and the complaint that those authorities did nothing to advance the extradition process, the Minister wrote:

> I am satisfied that the three-year delay in this case (from the date of Mr. Cavan's arrest on November 26, 2009, to the request for his extradition on September 14, 2012, and which was perfected when the ROC was certified on December 3, 2012) was not as a result of bad faith, or for an improper motive. Therefore, there is no basis to conclude that the conduct of Canadian or American authorities was abusive.

[36] A few paragraphs later, the Minister expressed his conclusion on the applicant's submission about delay and abuse of process.

> In conclusion, it has not been established that the delay in this case amounts to an abuse of process or that Mr. Cavan's surrender under the circumstances would be "shocking to the conscience" of Canadians, be "simply unacceptable" or contrary to the principles of fundamental justice.

> Accordingly, I am of the view that Mr. Cavan's surrender cannot be denied on the basis of delay.

### The Arguments on Review

[37]   The applicant says that the doctrine of abuse of process is not limited to cases of bad faith or improper motive on the part of state authorities. To be certain, bad faith or improper motive are relevant considerations in the abuse of process analysis, but not conditions precedent to a successful claim. It follows, the applicant continues, that he was under no obligation to make out a case of either and the Minister was wrong in requiring him to do so.

[38]   The applicant contends that the doctrine of abuse of process protects the repute of the administration of justice. It has nothing to do with the merits of the state's case either for extradition or at trial in the requesting jurisdiction. The doctrine is flexible and subsumed under s. 7 of the *Charter*. To subject the applicant to surrender in light of the delay in the extradition partner's pursuit of extradition after the alleged offence and Grand Jury indictment would offend the community's sense of fair play and decency, amount to an abuse of process and offend the principles of fundamental justice. The emphasis placed on the requirement of "shocking the conscience" or being "simply unacceptable" obscured the test the Minister should have applied in making his surrender decision.

[39]   The respondents begin with a reminder about the standard of review we are to apply. The standard is reasonableness, a benchmark that posits a range of possible outcomes, not a single, exclusive response. In this case, the respondents say, the Minister considered the relevant facts and reached a conclusion that falls within the range of supportable outcomes.

[40]   The respondents contend that the applicant's argument about abuse of process rests exclusively on a claim of unreasonable or undue delay in the initiation of extradition proceedings. Unlike in domestic proceedings to which s. 11(b) of the *Charter* would apply, the delay here must take cognizance of the international nature of these proceedings. To make out a claim of abuse of process based on delay, the applicant must invoke the residual category of abuse of process. The authorities make it clear that in the residual category, stays for abuse of process are extremely rare and granted in only the clearest of cases where no other remedy is capable of eradicating the prejudice. This case does not ascend to that level.

### The Governing Principles

[41]   The combined effect of several principles assists in the determination of this ground of appeal. Some describe the standard of review of a surrender decision. Others define the scope of the doctrine of abuse of process. Still others interpret the duty of the Minister under s. 44(1)(a) of the *Extradition Act*. And others describe the extent to which, if at all, Canadian authorities can direct the manner in which our extradition partners carry out their investigation of offences and pursuit of extradition proceedings.

### *The Surrender Decision*

[42]  After committal, an extradition request reverts to the Minister who reviews the case in its entirety and determines whether, and if so on what basis, to order the surrender of the person sought. This requires the Minister to determine whether it is politically appropriate and not fundamentally unjust for Canada to extradite the person the extradition partner seeks: *Extradition Act*, s. 40(1); *Fischbacher v. Canada (Minister of Justice)*, 2009 SCC 46, [2009] 3 S.C.R. 170, at para. 36.

[43]  The Minister's authority to order or refuse surrender is subject to the provisions of the Act and Treaty. The Minister must exercise his authority in conformity with the *Charter*: *Fischbacher*, at para. 36.

[44]  Several provisions of the Act, under the sub-heading *Reasons for Refusal*, circumscribe the Minister's surrender power in s. 40(1). Some provisions are mandatory, barring surrender in defined circumstances. Others are discretionary, permitting but not requiring refusal in other circumstances.

[45]  Under s. 44(1)(a), the Minister must refuse to order surrender if the Minister is satisfied that the surrender would be unjust or oppressive having regard to all the relevant circumstances. Under this provision, the Minister must consider all relevant circumstances, each on its own and together with the rest, to determine whether surrender would be unjust or oppressive: *Fischbacher*, at para. 37; *United States of America v. Johnson* (2002), 62 O.R. (3d) 327 (C.A.), at para. 45. Inclusion of the term "satisfied" in s. 44(1)(a) reposes a discretion in the Minister: *Fischbacher*, at para. 37.

[46]  To make a surrender decision, the Minister must undertake a balancing of all the relevant circumstances, weighing factors that militate in favour of surrender, on the one hand, against those that advocate against surrender, on the other. The "relevant" circumstances will vary, of course, from one case to the next. Included within the broad embrace of "relevant" may be:

>    i.  any representations (on the issue of surrender) made on behalf of the person sought;
>
>    ii. the conduct of the proceedings in the requesting state before and after the extradition request;
>
>    iii. the potential punishment on conviction in the requesting state;
>
>    iv. the personal circumstances of the person sought;
>
>    v.  the timeliness and manner of prosecuting the extradition proceedings in Canada; and
>
>    vi. the need to respect the constitutional rights of the person sought and Canada's international obligations under the Treaty and as a responsible member of the international community: see *Fischbacher*, at para. 38; *United States of America v. Bonamie*, 2001

ABCA 267, 293 A.R. 201, at para. 54; *United States of America v. Cobb*, 2001 SCC 19, [2001] 1 S.C.R. 587, at para. 34.

[47] Section 44(1)(a) entitles the Minister to refuse surrender in the absence of a *Charter* breach, provided the Minister is satisfied that surrender would be unjust or oppressive in all the relevant circumstances. A *Charter* breach may not be alleged. Or alleged, but not established. Despite the constitutionality of surrender, the Minister may refuse surrender if surrender would be unjust or oppressive in all the circumstances.

[48] The exercise of the Minister's power of surrender implicates the liberty and, in some cases, the security of the person sought. As a result, the Minister owes a duty of fairness both at common law and in accordance with the principles of fundamental justice under s. 7 of the *Charter*: *Nemeth v. Canada (Minister of Justice)*, 2010 SCC 56, [2010] 3 S.C.R. 281, at para. 70.

[49] Under s. 44(1)(a), the Minister must have a wide measure of appreciation of what circumstances are "unjust or oppressive". The burden of demonstrating that "unjust or oppressive" circumstances exist falls upon the person sought: *Fischbacher*, at para. 37; *Nemeth*, at para. 72; *Lake v. Canada (Minister of Justice)*, 2008 SCC 23, [2008] 1 S.C.R. 761, at paras. 38-39.

## Supervision of Proceedings in Foreign Jurisdictions

[50] Actions undertaken by the Government of Canada in extradition proceedings are subject to *Charter* scrutiny. But the *Charter* does not govern the actions of the extradition partner. The *Charter* does not operate extraterritorially to superintend the manner in which offences alleged to have been committed in a foreign jurisdiction are investigated and prosecuted: *Canada v. Schmidt*, [1987] 1 S.C.R. 500, at p. 518.

## Abuse of Process and the Principles of Fundamental Justice

[51] In domestic proceedings, we recognize two categories of abuse of process. Each would also be captured by s. 7 of the *Charter*. Each is rooted in state conduct. The main category encompasses state conduct that affects the fairness of the trial. The residual category takes in state conduct that contravenes fundamental notions of justice and thus undermines the integrity of the judicial process: *R. v. O'Connor*, [1995] 4 S.C.R. 411, at para. 73; *R. v. Nixon*, 2011 SCC 34, [2011] 2 S.C.R. 566, at para. 36; *R. v. Babos*, 2014 SCC 16, [2014] 1 S.C.R. 309, at para. 31.

[52] Abuse of process does not require evidence of bad faith or an improper motive on the part of the foreign authorities. It also captures conduct that falls short of bad faith but still risks undermining the integrity of the justice system: *Canada (Attorney General) v. Barnaby*, 2015 SCC 31, 323 C.C.C. (3d) 185, at para. 10; *Babos*, at paras. 36-37.

[53] The test used to determine whether a stay of proceedings is warranted in domestic

cases under either category comprises three requirements:

    i.    prejudice to an accused's right to a fair trial or the integrity of the justice system that will be manifested, perpetuated or aggravated through the conduct of the trial or its outcome;

    ii.    no alternative remedy capable of redressing the prejudice; and

    iii.    in the event of uncertainty after completion of steps i and ii, a balancing of interests in favour of the stay against the interest society has in having a final decision on the merits: see *Babos*, at para. 32. See also *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297, at paras. 54 and 57.

[54]    In the residual category, prejudice to an accused's interests is relevant, but not determinative. In most cases an accused will have to demonstrate that the state conduct prejudiced him or her in some significant way in order to make out a case for abuse of process. But the prejudice component is better conceptualized as an act tending to undermine society's expectations of fairness in the administration of justice: *Nixon*, at para. 41. The question is whether the state's interest is offensive to society's notions of fair play and decency and whether proceeding with a trial in the face of that conduct would be harmful to the integrity of the justice system. State conduct that exceeds society's tolerance harms the integrity of the justice system: *Babos*, at para. 35.

[55]    The balancing stage of the test, which need only be undertaken when uncertainty remains after completion of the first two stages, assumes added importance under the residual category: *Babos*, at para. 41. The question there is which of two options better protects the integrity of the system: staying the proceedings or having a trial despite the impugned conduct: *Babos*, at para. 41.

[56]    At the root of each category of abuse of process rests state conduct. Where the state conduct implicates the fairness of trial proceedings, the main category applies. The concern is whether there is ongoing unfairness to the accused: *Babos*, at para. 34. In the residual category, the conduct does not implicate the fairness of trial proceedings, rather its condonation would tarnish the integrity of the court: *Nixon*, at para. 41.

[57]    In either category, stays of proceedings for abuse of process are limited to the clearest of cases: *Babos*, at para. 31; *O'Connor*, at para. 68. The balancing of societal interests that must take place and the "clearest of cases" threshold present a claimant who seeks a stay under the residual category with an onerous burden. Cases warranting a stay in the residual category will be "exceptional" and "very rare": *Babos*, at para. 44; *Canada (Minister of Citizenship and Immigration) v. Tobiass*, [1997] 3 S.C.R. 391, at para. 91. It is only where the "affront to fair play and decency is disproportionate to the societal interest in the effective prosecution of criminal cases" that a stay will be warranted: *Babos*, at para. 44; *R. v. Conway*, [1989] 1 S.C.R. 1659, at p. 1667.

### The Standard of Review

[58]  On review, provided the Minister applies the correct legal test and does not otherwise err in law or contravene principles of natural justice, deference is owed to the Minister's decision on surrender: see *Lake*, at para. 34, 41; *United States of America v. Magnifico*, 2007 ONCA 535, 223 C.C.C. (3d) 129, at para. 26. The standard of review for the Minister's decision is reasonableness even where the person sought contends that extradition would offend his or her rights under the *Charter*: *Lake*, at para. 34. Interference with the Minister's decision is limited to exceptional cases of "real substance": *Schmidt*, at p. 523; *Lake*, at para. 34.

[59]  The standard of reasonableness does not command that reviewing courts be blindly submissive to the Minister's assessment. That said, the standard does entail more than one possible conclusion. Our role is not to reassess the relevant factors and substitute our own view for that of the Minister. What we must decide is whether the Minister's decision falls within a range of reasonable alternatives. We must ask ourselves:

> Did the Minister consider the relevant facts and reach a defensible conclusion based on those facts?

Provided the Minister has identified the proper test, his conclusion should be upheld unless it is unreasonable, that is to say, falls outside the range of reasonable outcomes: *Lake*, at para. 41.

### The Principles Applied

[60]  The applicant alleges error in the test the Minister applied in rejecting the submission that surrender would constitute an abuse of process or be unjust or oppressive within s. 44(1)(a) of the *Extradition Act*. I would not give effect to this ground of appeal.

[61]  The standard of review in this case is reasonableness. The applicant is correct to say that the Minister erred in his statement that bad faith or improper motive are conditions precedent to a successful claim of abuse of process; however, reading his decision as a whole, the Minister applied the correct test.

[62]  The Minister's reasons indicate that he considered all of the relevant factors pertaining to the issue before him, including the delay, Cavan's re-incarceration and any potential prejudice. In addition, as the applicant put the *bona fides* of the requesting state in issue, it was appropriate for the Minister to consider whether the request for extradition was made in good faith or for some colourable purpose.

[63]  In any event, the standard to be met to establish an abuse of process – a showing that the state conduct risks undermining the extradition process – is so far removed from what occurred here as to make the error of no consequence to the result.

[64]   In reviewing the Minister's surrender decision on a standard of reasonableness, I proceed from a standard of deference owing to the discretionary nature of the decision, the superior expertise of the Minister and his obligation to ensure that Canada complies with its international obligations. His decision is principally an exercise of executive discretion, essentially political in nature, and at the extreme legislative end of the continuum of administrative decision-making.

[65]   Further, I am mindful of the admonition that interference with the Minister's decision on surrender is to be limited to exceptional cases of "real substance".

[66]   Two reasons persuade me that the Minister's decision to reject the applicant's claims that an order of surrender would be an abuse of process or unjust or oppressive falls within a range of reasonable outcomes and accordingly is not unreasonable.

[67]   First, the applicant's invocation of the residual category of abuse of process requires a showing that the state conduct risks undermining the integrity of the extradition process. Such a showing would require evidence of conduct that is offensive to societal notions of fair play and decency. Cases warranting a stay of proceedings, and thus a refusal of surrender, on this ground are exceptional and rare. Nothing that occurred here amounts to an affront to fair play and decency that is disproportionate to the societal interest in the effective discharge of our international obligations to those accused of serious crimes in the jurisdiction of our extradition partner.

[68]   Second, the claim of abuse of process, injustice or oppression ultimately reduces to a submission of undue delay in the initiation of extradition proceedings. A complaint of this kind comes uncomfortably close to an attempt to impose our standards on the timeliness of trial proceedings on foreign authorities or at least to gauge their conduct by such a standard. And this we cannot do. Not directly. And not indirectly.

[69]   The Minister made an inquiry about the time that had elapsed from indictment to the initiation of extradition proceedings. He received a response, on its face reasonable – the accused persons had been indicted two days after the investigation concluded, and additional information in support of the charges had been gathered. The involvement of two different jurisdictions in the extradition of one of Cavan's co-defendants had required consultation and coordination. It was not unreasonable for the Minister to accept this response.

**Ground #2: Alleged Error in Assessment of Prejudice**

[70]   The second ground on which the applicant argues the Minister's surrender decision was unreasonable has to do with the Minister's assessment of prejudice attributable to the delay in initiation of the extradition proceedings by the U.S. authorities. The error alleged is twofold. First, the Minister limited his assessment of prejudice to the impact of delay on the extradition hearing. And second, he failed to consider the prejudice caused to the applicant by the communication of information about the outstanding charges in the United States to Canadian authorities and its impact on the suspension and cancellation of the applicant's parole and his incarceration to serve the balance of his sentence.

## The Reasons of the Minister

[71]  In addition to the passages of the Minister's letter to counsel cited in paras. 34 and 35 of this judgment, the following passage is relevant to this ground:

> I have considered whether Mr. Cavan has been prejudiced by the delay. The Supreme Court of Canada has determined that only delay which impairs the ability of the person sought to adequately prepare for an extradition hearing is relevant to my decision on surrender. You have not provided me with any evidence to suggest that Mr. Cavan's ability to defend himself in the Canadian extradition proceedings has been prejudiced by delay. Any other delay, and in particular delay which impacts on the ability of the defendant to present a full answer and defence, should be addressed at trial in the foreign state (*United States v. Allard*, [1987] 1 SCR 564).

## The Arguments on Review

[72]  The applicant contends that the Minister wrongly restricted his consideration of prejudice to the impact of delay on the conduct of the extradition hearing. In doing so, the applicant says, the Minister wrongly conflated the jurisdiction of the extradition judge at the committal hearing with his own authority on surrender. The Minister is not required to find a nexus between the conduct alleged to constitute an abuse of process and the committal hearing in order to refuse surrender. The Minister's authority under s. 44(1)(a) of the Act is more expansive and not limited to or dependent upon a finding that the delay impaired the applicant's ability to prepare for the extradition hearing.

[73]  In addition, the applicant says, the Minister took an unreasonably narrow view of prejudice in connection with the impact of the extradition partner's conduct on the parole revocation proceedings. The suspension, later revocation, of the applicant's parole was based largely on information supplied by the DEA about the outstanding U.S. proceedings. The result was that the applicant was reincarcerated until his warrant expiry date. Having provided the information to Canadian authorities, the applicant submits, the United States was obliged to move expeditiously with the extradition proceedings. Its failure to do so should have resulted in refusal of surrender.

[74]  The respondents disclaim any nexus amounting to an abuse of process between the extradition proceedings and the decision of PBC to suspend, then revoke, the applicant's parole.

[75]  The respondents say neither the initiation nor the timing of extradition proceedings were of any moment to the authority or decision of the PBC to suspend and later revoke the applicant's parole. The PBC exercises an inquisitorial function. It can rely on a wide variety of information from domestic and foreign sources to carry out its mandate. The range of material on which the Board can rely includes information indicative of a return to criminal activity whether charged, proven, stayed, withdrawn or dismissed. The extradition partner had

no status before the Board. The applicant had the right to appeal or judicially review to Board's decision but chose not to do so.

[76] The respondents point out that the delay in instituting extradition proceedings had no impact on the period the applicant would spend in custody. Once parole had been revoked, subject to his right to re-apply or review the revocation decision, the applicant would remain in custody until his warrant expiry date with or without any extradition proceedings.

## The Governing Principles

[77] In addition to the principles already canvassed and in no need of repetition, it is helpful to add a brief reference to the relationship between the domestic proceedings before the PBC and the impact of parole revocation on surrender for extradition.

[78] Whether a prisoner serving a penitentiary sentence in Canada will receive parole and, if so, when and on what basis is determined by the PBC. It is of no moment to eligibility whether the sentence being served is for a domestic crime or for an offence committed elsewhere and served here under the *International Transfer of Offenders Act*. The Board is not a court. It is not bound by the traditional rules of evidence, but rather may act on information that would not be admissible in criminal trial proceedings.

[79] Nothing disentitles the PBC from acting on information gathered in a foreign jurisdiction. That said, foreign law enforcement authorities have no standing before the Board. Whether the foreign information is conveyed to the Board depends on domestic authorities. The use, if any, the Board makes of the information is determined by the Board in the exercise of its discretion.

[80] Section 64(1) of the *Extradition Act* governs cases in which a surrender order is made in respect of a person who was serving a sentence in Canada after conviction of an offence. The general rule enacted by this section is that the surrender order does not take effect until the person has been discharged from custody. It is of no moment whether the discharge is the result of an acquittal, the expiry of the sentence, or some other reason. The timing of the extradition proceedings would seem of no consequence to the prisoner's surrender, absent a contrary order by the Minister: *Hanson v. Canada (Minister of Justice)*, 2005 BCCA 77, at para. 12.

[81] The rule of no surrender until discharge is not unyielding. Section 64(1) expressly authorizes the Minister to order otherwise. And s. 66(1) permits the Minister to make an order of temporary surrender to the extradition partner.

## The Principles Applied

[82] I would reject the applicant's claim that the surrender decision is unreasonable because the Minister erred in his assessment of prejudice when considering whether to refuse surrender under s. 44(1)(a) of the Act.

[83]   The decision of the Minister under s. 44(1)(a) of the Act is essentially an exercise of discretion. This arises from the use of the term "satisfied" and despite the mandatory "shall refuse" in the introductory words of the subsection. The subsection contains no exhaustive or illustrative list of factors for the Minister to consider, but rather envisages an assessment of all the circumstances and a balancing of those factors that favour surrender and those that counsel otherwise. Decisions that involve the exercise of discretion are notoriously the subject of deference on review.

[84]   Second, the fact that the extradition proceedings were outstanding formed no part of the decision of the PBC to suspend and later revoke the applicant's parole. That decision was based on the applicant's alleged involvement in an agreement to unlawfully import cocaine into Canada for sale here and his association with others with whom contact was prohibited under the terms of his parole. It was the applicant's own conduct that compromised his conditional liberty, not the fact of extradition proceedings or any delay in initiating them.

[85]   Third, it does not follow, as the applicant seems to suggest, from the fact U.S. authorities provided information to their Canadian counterparts about the alleged criminal activity of the applicant that the United States authorities were bound to accelerate the initiation of extradition proceedings.

[86]   Extradition proceedings inevitably involve alleged criminal activity in the jurisdiction of the extradition partner. The manner in which the investigation proceeds in connection with the activity is up to the law enforcement authorities in the jurisdiction where it occurs. Likewise, the decision about extradition proceedings. Whether they will be taken. When. On what basis. The requested state does not call the tune. International comity dictates otherwise.

[87]   Fourth, any collateral consequences in Canada of alleged criminal activity in the United States are of no moment to United States authorities. Neither the fact nor the nature of these consequences imposes any obligation on the United States authorities to hasten their decision about extradition proceedings or the pace at which those proceedings are pursued. It is their case to make, not ours to dictate.

[88]   In addition, once the PBC revoked the applicant's parole and he was recommitted to serve the balance of his sentence, failing a contrary order by the Minister, s. 64(1) of the Act mandated that no surrender would take effect until the remanet of the applicant's sentence expired. No prejudice ensued from the pace at which extradition proceedings were pursued.

[89]   Reading the reasons of the Minister as a whole, I am not persuaded that the erroneous reference to the impact of delay on the applicant's ability to adequately prepare for the extradition hearing (which had already been held) renders the surrender decision unreasonable. The applicant consented to committal, a step that put paid to any claim of prejudice in that respect. But the Minister went on to consider other aspects of prejudice that might ensue from delay. Such as its effect on the applicant's ability to defend himself in the United States proceedings. He also weighed potential prejudice against Canada's international obligations to its extradition partner. His conclusion was not unreasonable.

## Ground #3: Alleged Unfair Burden of Proof

[90]  The final ground advanced by the applicant concerns the Minister's authority under s. 64(1) of the Act to order that surrender take place before expiry of a sentence of imprisonment the person sought is then serving.

### The Reasons of the Minister

[91]  The Minister considered the submission that Canadian authorities did nothing to advance the extradition proceedings while the United States charges prevented the applicant's release on parole. The Minister wrote:

> With respect to your submission that Canadian authorities did nothing to advance this matter while the pending U.S. charges prevented Mr. Cavan from being released on parole, I note that an earlier extradition request would not have changed the fact that the U.S. charges would still have been pending until at least such time as Mr. Cavan was surrendered to the United States. With respect to persons sought serving sentences in Canada, I note that section 64 of the Act provides that, unless I order otherwise, a surrender order does not take effect until after the person has been discharged whether by expiry of the sentence or otherwise. Your materials indicate that Mr. Cavan was not eligible for statutory release until September 5, 2013, and that his sentence does not expire until July 27, 2015. In the circumstances, it is not apparent that an earlier request for extradition would have resulted in Mr. Cavan's earlier release from custody in relation to the sentence he is currently serving in Canada.

### The Arguments on Review

[92]  The applicant contends that the Minister placed an unfair burden on him to show that an earlier request for extradition *would* have resulted in his earlier release from custody on his U.S. sentence that had been transferred to Canada. Early surrender is in the hands of the Minister. It follows, the applicant says, that the burden should be on the Minister to explain why he would not have made an order under s. 64(1) had the extradition proceedings been instituted more promptly. In addition, the Minister failed to consider an order for temporary surrender under s. 66 of the Act.

[93]  The respondents point out that the complexities inherent in extradition proceedings engender delay. The underlying investigation within the jurisdiction of the extradition partner must be completed. In this case, the offence alleged to have been committed extended over a year, involved several alleged participants, included two separate prosecutorial authorities and required concurrent proceedings against the alleged parties to ensure contemporaneous apprehension. The Minister cannot dictate the pace of the foreign investigation or extradition proceedings.

[94]    The respondents say a fair reading of the Minister's reasons fails to reveal the imposition of any burden on the applicant as he claims. As a general rule, surrender awaits sentence expiration. The Minister simply pointed out that it was not apparent that an earlier extradition request would have made a difference. Such an observation does not impose a burden on the applicant to demonstrate the contrary.

## The Governing Principles

[95]    Earlier in these reasons, I canvassed the operation of the provisions of s. 64(1) of the Act. No purpose will be served by their repetition here.

## The Principles Applied

[96]    I would not give effect to this complaint. My reasons for rejecting it are brief.

[97]    First, I do not read the reasons of the Minister as imposing a burden on the applicant to demonstrate that more timely initiation of the extradition proceedings would have resulted in the applicant's earlier release. The reasons simply point out the general rule that s. 64(1) puts in place. This observation about the practical impact of the statutory provision does not, in terms or by necessary implication, impose any burden on the applicant.

[98]    Second, a contrary order by the Minister based simply on delay would offend comity in that it would necessarily imply ministerial authority to superintend the manner in which foreign authorities conduct their business. No such authority resides in the Minister.

## CONCLUSION

[99]    For these reasons, I would dismiss the application for judicial review and affirm the surrender decision of the Minister.

Released: October 2, 2015 (DW)

"David Watt J.A."

"I agree S.E. Pepall J.A."

"I agree Grant Huscroft J.A."