G4mecavc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4                 v.                        09 CR 1120(PKC)

5    HAN CAVAN,

6                   Defendant.

7    ------------------------------x

8
                                           April 22, 2016
9                                          11:14 a.m.

10
     Before:
11
                      HON. P. KEVIN CASTEL,
12
                                           District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EDWARD IMPERATORE
17        Assistant United States Attorney

18   ARNOLD JAY LEVINE
          Attorney for Defendant
19

20

21

22

23

24

25

G4mecavc

1          (In open court)

2          THE DEPUTY CLERK:  United States of America against

3     Han Cavan.

4          MR. IMPERATORE:  Good morning, your Honor.  Edward

5     Imperatore for the government.

6          THE COURT:  Good morning, Mr. Imperatore.

7          MR. LEVINE:  Good morning, your Honor.  Arnold Levine

8     for Mr. Cavan.

9          THE COURT:  Good morning, Mr. Levine.  Good to see

10    you.  Haven't seen you in a while.  You don't call.  You don't

11    write.  Good to see you, though.

12         And good morning, Mr. Cavan.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  So I have the motion to dismiss.  I have

15    gone through the relevant case law, *Doggett* and *Barker*, and

16    there is some agreement between the parties and some

17    disagreement.  But one of the key points of agreement is that

18    while I can look at the totality of time in considering issues

19    such as prejudice, the focus of my inquiry is the time period

20    from the indictment of Mr. Cavan to the September 14, 2012,

21    request for extradition of Mr. Cavan.  What happens afterwards

22    may be relevant, but that appears to be from the briefing the

23    focus of the parties' attention.

24         Do you agree with that, Mr. Levine?

25         MR. LEVINE:  Your Honor, I think my focus was broader,

G4mecavc

```
 1   and that it was -- well, actually, I guess the September 2012,
 2   you said, right?
 3            THE COURT:  Yes.
 4            MR. LEVINE:  No, I apologize.  Yes.  That three-year
 5   period between the indictment and their request --
 6            THE COURT:  Thirty-four months I calculated.
 7            MR. LEVINE:  Yes.
 8            THE COURT:  Yes.  Yes.  And I want to in the first
 9   instance, I want to hear from the government.
10            So this is a period of delay.  It seems to me that is
11   longer than ordinary delay and warrants consideration of the
12   other Barker factors.  So I want to know what the government's
13   response is, and I want to know whether anybody wants an
14   evidentiary hearing.
15            So let me hear from Mr. Imperatore.
16            MR. IMPERATORE:  Your Honor, the Court has before it a
17   very thorough and well developed factual record of the minister
18   in Canada, as well as the Court of Appeals decision, which
19   spell out --
20            THE COURT:  Yeah, well, that's all after September 14,
21   2012.
22            MR. IMPERATORE:  But that opinion describes for the
23   Court the circumstances of the defendant's incarceration before
24   that.
25            THE COURT:  I got that.  So why don't you tell me what
```

G4mecavc

the United States was doing between the day of indictment and

the day the United States first sought extradition, because

that 34-month period and the government's actions during that

34 months is a focal point of this motion.

And shouldn't it be, Mr. Imperatore?

MR. IMPERATORE:  Yes, your Honor.  But also taken into

account are the causes for the defendant's incarceration in

Canada.  And as we've highlighted in our submission, his

incarceration is attributable to his own conduct and his own

parole violation.

THE COURT:  His incarceration in Canada, but that has

nothing to do with his extradition, does it?

MR. IMPERATORE:  It does, your Honor, insofar as --

THE COURT:  Well, let's say the Canadian authorities

did not elect to incarcerate him, and he was at large in Canada

but the United States knew exactly where he was in Canada.  How

would this be any different?

MR. IMPERATORE:  It would be different, your Honor, in

that it's possible under the scenario your Honor has

highlighted that he could have arrived in the United States

sooner, if the government had pursued him sooner.  The

difference here is that, as the Canadian court spelled out, he

would have been incarcerated in Canada until July of 2015,

regardless of when the government sought his extradition.

That's under Section 64 of the Extradition Act.

G4mecavc

1          THE COURT:  Well, unless the Minister of Justice

2     decides otherwise.

3          MR. IMPERATORE:  Correct.  Which he did not do in this

4     case.

5          THE COURT:  Which he did not, in fact, do.  Did the

6     United States ask him to do so?

7          MR. IMPERATORE:  I'm not aware that the government

8     did, but I think that's beside the point here, your Honor,

9     because the decision is ultimately up to the minister under

10    Canada's own --

11         THE COURT:  So basically what your position is is the

12    diligence, or lack of diligence, of the United States during

13    the 34-month period is utterly irrelevant?  Is that your

14    position?

15         MR. IMPERATORE:  It's not that it's irrelevant, your

16    Honor.  It comes into play under certain of the *Barker* factors.

17         And just to be clear on the government's position, as

18    an initial matter, the cause for the delay and the prejudice

19    suffered favored the government because of the point I just

20    mentioned, which is he would have been incarcerated anyway

21    until July of 2015, regardless of what the government did.

22         But in any event, the government took steps which,

23    under the *Barker* factors and under case law developing *Barker*,

24    were entirely reasonable in the circumstances.

25         THE COURT:  Well, the government went to a grand jury

G4mecavc

1   and presented the evidence that it had, and it secured an

2   indictment, correct?

3           MR. IMPERATORE:  That's correct.

4           THE COURT:  All right.  What else did it need that it

5   didn't have at that moment in time to apply to have him

6   extradited?

7           MR. IMPERATORE:  Well, as the exchange of drafts,

8   draft extradition requests reflect, there is a heightened

9   standard here for the government to satisfy Canada's demands

10  and to satisfy Canada's questions.  Implicit in the exchange of

11  drafts is the notion that Canada has questions about what the

12  government's proof will be.

13          THE COURT:  Well, instead of being abstract, tell me

14  specifically, what was it that the government was not able to

15  do at the time of indictment, and how did it later become able

16  to do it?  So --

17          MR. IMPERATORE:  I'm sorry.  Could the government have

18  submitted an extradition request at that moment?  Is that --

19          THE COURT:  That's essentially the question.  Why

20  couldn't the government have sought extradition in

21  November 2009?

22          And then the Minister of Justice might say, you know,

23  waiting until 2015 and the sentence is up is a long, long time.

24  I'm going to allow this person to be extradited to the United

25  States.

G4mecavc

1          MR. IMPERATORE:  I think -- I mean, it's theoretically

2     possible that the government could have sought extradition at

3     that time.  But the reasons it didn't were reasonable in the

4     circumstances.

5          THE COURT:  So tell me what the reasons were.

6          MR. IMPERATORE:  So the reasons were, first of all, as

7     under the Extradition Act, he would not have been extradited

8     anyway until July.

9          THE COURT:  Well, no, Mr. Imperatore.  What I'm asking

10    you to tell me:  Are you representing to the Court that the

11    United States Attorney's Office for this district or the

12    Department of Justice made a conscious decision, based upon

13    that statute; that they looked at the statute, they saw this,

14    and then they decided that they were not going to proceed

15    because this was an obstacle; or is this an after-the-fact

16    reconstruction?  That's the question I'm putting to you.

17         MR. IMPERATORE:  Your Honor, it's difficult for me to

18    answer that question, because I wasn't on this case at that

19    time.

20         THE COURT:  I know you weren't.

21         MR. IMPERATORE:  But the Court --

22         THE COURT:  Have you spoken to the people who were on

23    the case at the time?

24         MR. IMPERATORE:  Yes, I have.

25         THE COURT:  All right.

G4mecavc

1          MR. IMPERATORE:  And it's my understanding from

2    speaking with people who were on the case at the time that they

3    understood that there was no urgency in doing this because he

4    was going to be incarcerated in Canada anyway.

5          But regardless, under the factors, as courts have

6    explained, when the government takes various steps, even in the

7    absence of his being incarcerated, when it takes steps, for

8    example, to develop its proof -- and we're not saying that was

9    the calculus here.  But when the government takes steps, for

10   example, to cooperate witnesses, to develop the proof against

11   the defendant, under the *Barker* analysis and under the cases

12   that develop it, that is a valid reason for the delay.  And

13   again, we're not saying that that was a conscious calculus on

14   the part of the government, but the government did take those

15   steps.  It did proffer with Kaup and Mawhinney.  It did

16   exchange drafts of extradition requests that discussed the

17   status of other defendants and what the state of the

18   government's proof was.

19          THE COURT:  Exchanged drafts with who?

20          MR. IMPERATORE:  With OIA and Washington.

21          THE COURT:  So in other words, the government itself

22   internally was exchanging drafts?

23          MR. IMPERATORE:  That's correct.

24          THE COURT:  And what can you tell me, though -- I

25   mean, the question still remains:  What is it that the

G4mecavc

1  government didn't know on the day after indictment that it

2  needed to know?  And when did it learn that which it needed to

3  know?

4          MR. IMPERATORE:  I don't know the answer to that, your

5  Honor.  I think it's hypothetically possible the government

6  could have sought extradition at that time.  But under the

7  *Barker* analysis, that's not the relevant question, because the

8  question is whether the government was justified in taking the

9  steps that it did.  And in this case it was in light of the

10  findings made by the Canadian court about this --

11          THE COURT:  Yes.  But when you say "taking the steps

12  that it did," are you talking about efforts to obtain

13  cooperation agreements with codefendants?  Is that what you

14  mean by efforts?

15          MR. IMPERATORE:  Yes.

16          THE COURT:  All right.  But is the government telling

17  me that the delay is justified because there was a perceived

18  need to secure that cooperation before they could apply for

19  extradition?

20          MR. IMPERATORE:  That is an independent reason for

21  justification, your Honor.  But even assuming the government

22  never did anything, even assuming the government --

23          THE COURT:  Never mind about assuming they never did

24  anything.  Did the government make a conscious decision to not

25  apply for extradition because it didn't feel it had adequate

G4mecavc

1    information to do so and needed to at least attempt to secure

2    the cooperation of an additional witness?

3            MR. IMPERATORE:  Your Honor, my understanding from

4    speaking with people on the case at the time was that the

5    government didn't see any urgency in seeking extradition

6    because the defendant would have been incarcerated until

7    July 2015 anyway.

8            THE COURT:  Well, I don't mean to give you a rough

9    time, Mr. Imperatore.  I'm going to take that answer as a no to

10   my question, then?

11           MR. IMPERATORE:  Whether the government felt it needed

12   to cooperate people in order to submit the extradition request?

13           THE COURT:  Correct.

14           MR. IMPERATORE:  I believe it was a factor, but it's

15   difficult for me to represent that, your Honor, because I

16   wasn't there myself, and I wasn't the one making the decision.

17           THE COURT:  All right.  So, did the government obtain

18   this cooperation?

19           MR. IMPERATORE:  No.

20           THE COURT:  Well, how did it make an extradition

21   request, then?

22           MR. IMPERATORE:  Well, it made an extradition request

23   based on the information that it had.

24           THE COURT:  And the information it had, it had at the

25   time of indictment?

G4mecavc

1           MR. IMPERATORE:  That's correct.  But under the *Barker*

2    analysis, it's irrelevant at the end of the day, your Honor,

3    because he suffered no prejudice from this.  And the delay

4    wasn't attributable to the government.  It was attributable to

5    the defendant's own conduct in violating the terms of his

6    parole.

7           And as the Court in Canada explained, his parole

8    violation was based not only on the conduct that underlies the

9    indictment; it was also based on his association with known

10   drug dealers, which in and of itself is an independent reason

11   for a parole violation.

12          What's also significant here, and it's clear and

13   undisputed from the Canadian record, is that the defendant

14   never took any steps to challenge his parole violation.  He

15   never took any steps to review that decision that he would be

16   incarcerated until July of 2015.

17          THE COURT:  Tell me more about how -- is it the

18   Minister of Justice? -- exercises the discretion to honor or

19   not honor an extradition request before the expiration of the

20   Canadian sentence?

21          MR. IMPERATORE:  Yes.  What the opinion says --

22          THE COURT:  It's the Minister of Justice?

23          MR. IMPERATORE:  Yes, your Honor.  That's I believe

24   under Section 64 of the Extradition Act.  And this is at page

25   30 of the Court's decision, which is at Tab A.  It indicates

G4mecavc

that the surrender does not take into effect -- excuse me, a

surrender order does not take effect until after the person has

been discharged, whether by expiry of the sentence or

otherwise.

So what it's saying is even regardless of when the

Canadian court enters that surrender order, he's got to serve

his full sentence.

THE COURT:  Well, that's not what I understand you to

have said previously or -- my understanding of it at all.  I

understood that under the Canadian statute, the Minister of

Justice had discretion under the Canadian Extradition Act SC

1999, Chapter 18, Section 64.  The sentence needs to be served

in its entirety, quote, unless the minister orders otherwise,

closed quote.

So, what can you tell me about the exercise of

discretion by -- again, the question I asked you before was,

this is the Minister of Justice, is that correct?

MR. IMPERATORE:  That's my understanding, your Honor.

THE COURT:  Okay.  Tell me about how that discretion

is exercised.  And is this something, does the United States

request that the Canadian Minister of Justice exercises

discretion in one way or another?  Do they urge upon the

Minister of Justice that he exercises discretion?  Or does the

United States remain mute on this?  And I assume the United

States has a track record in other extradition proceedings.

G4mecavc

1    Did they usually ask for the minister to order otherwise?  Does

2    the minister usually grant that request, or does he usually

3    deny it, or always deny it, or always grant it?  What can you

4    tell me?

5              MR. IMPERATORE:  It's my understanding, your Honor,

6    from speaking with the Office of International Affairs in

7    Washington that the Justice Department typically does not ask

8    the minister to request -- does not ask him to exercise his

9    discretion in any particular way, and that the discretion is

10   his alone to decide how to exercise.

11             THE COURT:  Do you have an affidavit from anyone

12   within this office that so states?

13             MR. IMPERATORE:  I do not.  But I think that the

14   issue, though, your Honor, when the Court looks at it from the

15   perspective of the *Barker* factors, it's a distinction without a

16   difference, because even if the Justice Department had asked

17   the minister to exercise his discretion in a particular way,

18   it's his discretion alone.

19             THE COURT:  Correct.

20             MR. IMPERATORE:  He has given his reasoning for why

21   the defendant should be incarcerated until the time that he

22   was.

23             And we also make clear critically that it wasn't

24   because these charges were handed down that he violated his

25   parole.  There was two separate bases for that.  And that's

G4mecavc

1    something that the Court should consider as well when

2    evaluating the reason for the delay, as well as the prejudice,

3    any prejudice that was suffered.

4              THE COURT:  Was there evidence that the Minister of

5    Justice did consciously exercise discretion and exercise

6    discretion to deny an otherwise order?

7              MR. IMPERATORE:  I don't know the answer to that, your

8    Honor.

9              THE COURT:  Well, then, how do we know how the

10   Minister of Justice would have acted?

11             MR. IMPERATORE:  Well, I mean, it is apparent from

12   what he wrote, from what the minister wrote, that he understood

13   he had the discretion.  So I think it's implicit --

14             THE COURT:  All right.

15             MR. IMPERATORE:  -- in his rendering that decision

16   that he decided not to exercise his discretion.

17             THE COURT:  And where do I find the Minister of

18   Justice's statement?

19             MR. IMPERATORE:  It's in different places in -- it's

20   embedded in the opinion of the Court of Appeal at Exhibit A.

21   And there are block quotes, quotations from it.  I can pull

22   some quotations that are relevant to the Court's question, if I

23   may have a moment.

24             This is at page 30, your Honor.  There's a block

25   quote.  This is at Tab A of the government's brief.  The

G4mecavc

1    minister writes in his opinion -- it's quoted by the Court of

2    Appeals -- with respect to your submission that Canadian

3    authorities did nothing to advance this matter while the

4    pending US charges prevented Mr. Cavan from being released on

5    parole, I note that an earlier extradition request would not

6    have changed the fact that US charges would still have been

7    pending until at least such time as Mr. Cavan was surrendered

8    to the United States.  With respect to persons sought serving

9    sentences in Canada, I note that Section 64 of the Act provides

10   that unless I order otherwise, a surrender order does not take

11   effect until after the person has been discharged, whether by

12   expiry of the sentence or otherwise.

13          So it's clear from this passage that the minister

14   understood that it was he who had the discretion to order it,

15   and that he had made a decision not to exercise it in that

16   fashion.

17          THE COURT:  Tell me the sequence of events after the

18   application was made that demonstrates that the minister did

19   not so exercise his discretion.  In other words, the

20   application comes in in September 2012, and what happens then?

21   Did they put it on a shelf and say, well, he's got some time

22   that he owes us; we're not going to do anything with this?

23   What did the Canadian authorities do?

24          MR. IMPERATORE:  May I have a moment, please.

25          THE COURT:  Yes.  Well, I probably could read papers,

G4mecavc

1    too, but that's -- you can have a moment.

2         MR. IMPERATORE:  I'm sorry, your Honor.  I just want

3    to be correct on the dates.

4         THE COURT:  Go ahead.  Take your time.

5         MR. IMPERATORE:  So the minister ordered -- my

6    understanding is that there was briefing on this issue.  So

7    three months after -- this is at page six -- three months after

8    the formal extradition request, there was an authority to

9    proceed issued under the extradition request.  And then he was

10   formally arrested pursuant to that on March 1st of 2013.

11        THE COURT:  Taken into custody?

12        MR. IMPERATORE:  Taken into custody.

13        THE COURT:  Right.

14        MR. IMPERATORE:  And then he spent much of the next of

15   the -- and then after briefing, the minister ordered his

16   surrender for extradition on December 12th of 2013.

17        THE COURT:  Ordered his surrender for extradition?

18        MR. IMPERATORE:  Yes.

19        THE COURT:  So in other words, now, this is

20   interesting -- is this what you're telling me, that everything

21   was complete on the extradition as of -- give me the date again

22   in 2013.

23        MR. IMPERATORE:  So my understanding is the minister

24   ordered Cavan surrender for extradition to the United States on

25   December 12th of 2015.  But -- then this is at page 30 -- the

G4mecavc

1  minister found that pursuant to the Canadian Extradition Act,

2  Section 64, he would be imprisoned in Canada until July 25th of

3  2015, which is his parole expiry date regardless of when he had

4  issued an order of extradition.  In other words --

5          THE COURT:  So let me see.  You apply for extradition

6  in the fall of 2012, but an order of extradition was not issued

7  until about six months after he completed his Canadian

8  sentence, is that correct?

9          MR. IMPERATORE:  No, your Honor.  His Canadian

10  sentence was completed in July of 2015.

11          THE COURT:  Yes, well, you just said December 12,

12  2015, order for surrender --

13          MR. IMPERATORE:  I'm sorry.  December 12th of 2013.

14          THE COURT:  Okay.  All right.  Well, that's an

15  important difference.

16          So, there was a piece of paper in existence

17  December 2013 that in essence granted the extradition request;

18  is that correct?

19          MR. IMPERATORE:  Yes, that's my understanding.  But

20  what it also says is he's still going to remain in custody --

21          THE COURT:  I got that part.

22          MR. IMPERATORE:  Yes.

23          THE COURT:  I got that part.

24          So in other words, all proceedings associated with the

25  extradition were concluded by December 12, 2013, and the only

G4mecavc

1    thing remaining then was for the passage of time and for

2    Mr. Cavan to finish his Canadian time?

3            MR. IMPERATORE:  Yes.  But during that period Cavan

4    was also challenging the surrender order.

5            THE COURT:  I have it.  I have it.  But it was a final

6    order, subject to review and appeal, and all of that as of

7    December 12, 2013?

8            MR. IMPERATORE:  Yes.

9            THE COURT:  All right.  Let me hear from Mr. Levine.

10           MR. LEVINE:  Your Honor, if I can, I'll start with

11   that very last point, because I submitted with my papers the

12   letter from the Minister of Justice himself, rather than have

13   it be sort of two -- you know, two times removed by what

14   somebody else is saying the Minister of Justice said.

15           The Minister of Justice sent a letter to my client's

16   counsel in Canada explaining what the process was and what had

17   happened and what his findings were.  And that was in 2013.

18   The Minister of Justice said, I'm ordering that he be turned

19   over to the US.  He doesn't say in that letter, only after he

20   finishes his sentence in 2015.

21           In response to the Minister of Justice's order,

22   Mr. Cavan's counsel challenged that.  And the basis for the

23   challenge was the delay itself.  That was a large part of the

24   basis for the challenge, was that the US had taken three years

25   to do that.  And then in response to that, the Canadian

G4mecavc

1   Minister of Justice –– Canadian authorities then contacted the

2   US.  And that's why the letter from the office of international

3   whatever –– I'm, sorry whatever it's called –– the letter

4   included by the government in their response ––

5              THE COURT:  OIA, I think it is, something like that.

6              MR. LEVINE:  Right.

7          That letter was in response to that.  That letter

8   where they explain what they were doing in the meantime, why

9   they're delaying, was in response to the Canadian authority's

10  request in trying to litigate my client's argument that he

11  shouldn't be extradited because the US had taken three years

12  even to request it.  And so there's nothing in the minister's

13  letter that says, I'm deciding it now, I'm ordering him to be

14  surrendered, however, this will not take effect for another two

15  years.  There's nothing in that letter saying that.

16          But what happens right on top of that, or really was

17  part of that process, was that my client then was appealing it.

18  So it wasn't as if the Minister of Justice ordered the

19  surrender and then nothing happened for two years, waited until

20  sentence to expire and then he was surrendering.

21              THE COURT:  I got that.  But now this is at least

22  interesting to me.  It may or may not be relevant, but now take

23  me through:  When did the appeals expire?

24              MR. LEVINE:  The appeals I believe expired after

25  actually his sentence was completed already.  And then right

G4mecavc

1    after the appeal, he was returned to the US.

2              THE COURT:  So when did this sentence expire?

3              MR. LEVINE:  That was in July 2015?  November 2015.

4    July 2015.  And he was returned --

5              THE COURT:  And then when did the appeals expire?

6              MR. LEVINE:  That was with the decision that's part of

7    the record that both I and the government both submitted with

8    our papers, denying Mr. Cavan's appeal.

9              THE COURT:  That would be October, then, is that --

10             MR. LEVINE:  That sounds right.  October 2015, right.

11   And then he was extradited in November, November 2015, just a

12   month later.

13             THE COURT:  All right.

14             MR. LEVINE:  Or not even a month.

15             THE COURT:  Okay.

16             MR. LEVINE:  Judge, I know that the government also

17   keeps talking about him being imprisoned in Canada through

18   fault of his own, because of his conduct.  That was the subject

19   of this indictment.  And the only way the Canadian authorities

20   became aware of it was because the US, after getting an

21   indictment, instead of requesting his extradition, just told

22   the Canadian authorities that there was an indictment and had

23   him locked up instead.

24             THE COURT:  What were they?  Who had him locked up?

25             MR. LEVINE:  US contacted Canadian authorities to

G4mecavc

inform them, to inform the Canadian authorities that they had

an indictment and who his codefendants were on the indictment.

That's what led to his being locked up on parole violences.

THE COURT:  I understand that.  I understand that.

But it was the Canadians who decided to lock him up?

MR. LEVINE:  Right.  Of course, the US didn't -- could

have just requested extradition at that point also instead of

just -- instead of saying, here are these violations.

THE COURT:  But the flip side of that story is the US

says, now aware that the Canadians are holding him, the

exigency changes, they say, because they knew he was going to

be subject to being held all the way through to July of 2015.

MR. LEVINE:  Actually, Judge, the letter by OIA in

response to the Canadian authorities' request says that they

started their process when they realized that Mr. -- I believe

that Mr. Cavan was going to be due to be released in

September 2013.

THE COURT:  All right.

MR. LEVINE:  Not 2015.  At the time that the US

started their process, they didn't think he was going to be

released in 2015.  They thought he was going to be released in

2013.

THE COURT:  What happened that caused it to move from

2013 to 2015?

MR. LEVINE:  Well, I don't really know from the

G4mecavc

1    papers.  All the papers I have, I don't know how that Canadian

2    system worked and whether he was eligible for parole really in

3    2013 or whether he necessarily had to wait until 2015, whether

4    he would have been eligible for parole again during that time.

5              And I don't know -- and I couldn't tell whether -- and

6    certainly, as your Honor noted, the Minister of Justice as

7    requested could have ordered his release at any time.

8              THE COURT:  But just being fair to the record here,

9    the application for extradition was made in the fall of 2012.

10   So the government says, gee, we were in no rush up to that

11   point because we thought he was going to be held.  Now, whether

12   they thought he was going to be held until September 2013 or

13   September 2014 or July 2015, that, they say, helps them on why

14   it wasn't filed until 2012; and that whether their expectation

15   was his release in September 2013 or July 2015 would be --

16   would sound like it would be immaterial.

17             MR. LEVINE:  Well, it's not, because as your Honor

18   noted, the Minister of Justice had the discretion to order him

19   released and surrender to the US before the expiration of his

20   term, whether it be September 2013 or July 2015.  And the

21   government --

22             THE COURT:  Do you have any evidence that the Minister

23   of Justice exercises his discretion in extradition cases to

24   release people earlier to the United States?

25             MR. LEVINE:  I don't have that.  Of course I don't

G4mecavc

1    have the resources that the government does.  They would be the

2    ones who know, who would have direct knowledge of their

3    relationship with the Canadian authorities.

4          But without having asked the Canadian authorities to

5    do it, and without being denied by the Canadian authorities,

6    the government has no argument that their efforts would have

7    been futile.  And that's what they have to show.

8          THE COURT:  Well, is it a matter appropriately sought

9    by the foreign government, or is it a matter appropriately

10   sought by maybe a Canadian diplomatic official?

11         Or Mr. Cavan himself, presumably, could have said,

12   stop the madness here.  I want to be back in the United States

13   to promptly address these charges, and I urge you to exercise

14   your discretion so that I may do that.  I mean, that was open

15   to Mr. Cavan.

16         MR. LEVINE:  Well, Mr. Cavan couldn't ask to be

17   extradited before the government made a request for the

18   extradition in September 2013.

19         THE COURT:  No, he couldn't.  He couldn't.

20         But once the order was made in I think it was

21   December 12, 2013, he could have asked the Minister of Justice

22   to please exercise his discretion and let me go to the United

23   States to fight these charges.  Correct?

24         MR. LEVINE:  Conceivably.  However, he litigated the

25   issue based on the delay itself, which was three years before

G4mecavc

1   the government made their request.

2           And also, your Honor, as your Honor noted from the

3   beginning, the point in time that's really being litigated here

4   is those first three years, not what happened after, after the

5   government made their request.

6           THE COURT:  Now, let me just make sure I -- because

7   chronology here is very important.  How long after the

8   November 19, 2009, indictment did the Canadian authorities take

9   Mr. Cavan into custody?

10          MR. LEVINE:  I believe it was November.  Again, that's

11  I think also in the Court of Appeals decision.

12          THE COURT:  So it's the same month essentially?

13          MR. LEVINE:  Yes.  Within a very short time, it seems,

14  the US got the indictment, notified Canadian authorities about

15  the indictment, and that resulted in Mr. Cavan being locked up

16  in Canada for the conduct related to that indictment.

17          It also, your Honor, I think should be noted in terms

18  of how the Minister of Justice may have exercised discretion in

19  the case had the government requested, it's important to note

20  the sentence he was serving in Canada was not for committing a

21  Canadian crime.  It wasn't a sentence imposed by a Canadian

22  court.  It was a sentence imposed by a United States District

23  Court for the District of Minnesota for a crime committed in

24  the United States against the United States.  He was serving it

25  in Canada solely due to another treaty regarding transfer of

G4mecavc

1   prisoners.

2           THE COURT:  I understand.

3           MR. LEVINE:  So Canada's interest in keeping him,

4   holding him there to the expiration of his sentence, very good

5   chance that would have given way to the US, if the US requested

6   that its own sentence be terminated early so that they can get

7   him to try him on a different case.

8           THE COURT:  Well, I don't expect anyone in this

9   courtroom to be an expert on Canadian law.  But one would think

10  in a common law system that when the grant of extradition was

11  made in December, or the order for surrender for extradition

12  was made in December of 2013, that unless there was a stay in

13  place, what was holding him back from being extradited was the

14  sentence.

15          So, you know, there can be a statutory stay or a

16  rule-based stay or a discretionary stay, if it's as a result of

17  the ongoing challenge or -- was that the case?  Or was it

18  because he was in custody by reason of the parole violation

19  that caused reasonable lawyers to not trifle with the question

20  of a stay because he's in custody, he's not going anywhere so

21  there's no need to ask a Canadian judicial body for a stay?

22  Can you shed any light on that question?

23          MR. LEVINE:  I don't know whether a stay was

24  specifically requested or whether it was necessary to request

25  it, given that the appeal had been taken from --

G4mecavc

1          THE COURT:  I'm just thinking in our system, it

2     probably would be necessary.  You know, now, it could be that

3     an official exercises discretion not to execute the -- I don't

4     know.  But it wouldn't necessarily just happen in our system by

5     the mere election of the party who's the subject of the order.

6     To file a notice of appeal would not give them any rights to

7     remain, I don't think, unless there's a statute or rule that

8     provided it.

9          MR. LEVINE:  I can certainly try to look into that,

10    Judge.  I can try to contact my client's counsel from that case

11    again and ask whether a stay was required or requested.  As I

12    said, I don't know whether it was.  We just know that the

13    challenge was taken, and that within a month after he lost the

14    challenge, he was in the US.

15         THE COURT:  Right.  All right.  I am going to allow

16    each side to make a supplemental submission in the next --

17    would it be convenient to say the next 14 days?

18         MR. LEVINE:  Judge, I apologize for cutting you off.

19    I'm starting a homicide trial in Manhattan state court on

20    Tuesday, which will make it very difficult for me to get in a

21    supplemental briefing on this in the next 14 days.

22         THE COURT:  All right.  So when do you propose?

23         MR. LEVINE:  That trial I expect to last two to three

24    weeks.

25         THE COURT:  When do you propose, Mr. Levine?

G4mecavc

1          MR. LEVINE:  Closer to the end of May.

2          THE COURT:  Any objection from the government?

3    They'll be simultaneous.

4          MR. IMPERATORE:  No, your Honor.

5          THE COURT:  So May 27th.  And I will set a further

6    conference in this case -- would it be convenient and

7    appropriate to do that on June 24th, perhaps 2:30 p.m.?

8          MR. LEVINE:  That's fine for me.

9          THE COURT:  All right.  And the thought would be that

10   I would have a decision out either granting the motion -- or if

11   I have a decision out denying the motion, then we would take up

12   next steps on June 24.

13         MR. LEVINE:  We said 2:30 on the 24th?

14         THE COURT:  2:30.

15         MR. IMPERATORE:  Your Honor, if it would be helpful to

16   the Court, I just wanted to briefly address a couple points

17   raised by counsel.

18         THE COURT:  Sure.

19         MR. IMPERATORE:  So first of all, the Court had asked

20   questions about the relevant date of the extradition order,

21   taking into effect.  The minister made clear in his decision

22   that while he entered the surrender order in 2013, it would not

23   go into effect until July of 2015.

24         THE COURT:  When did he make -- did he make that clear

25   in 2013?

G4mecavc

         MR. IMPERATORE:  It appears so, your Honor.  This is

at page 30 of the Court of Appeal brief quoting the minister,

saying, a surrender order does not take effect until after the

person has been discharged, whether by expiry of the sentence

or otherwise.

         Secondly, counsel has made arguments about whether --

         THE COURT:  Did he reference the release date?

         MR. IMPERATORE:  Yes.  July 27, 2015.

         Secondly --

         THE COURT:  Well, that, I think, is -- maybe I don't

need anything.  I'm happy to take something supplemental, but I

think that's the answer to the question I was asking.

         Mr. Levine?

         MR. LEVINE:  I'm sorry, Judge.  I don't think it is,

because it's just continued reference to or otherwise means

that he knows that it doesn't have to be that date.

         THE COURT:  No.  This is the man with the discretion

saying it.

         MR. LEVINE:  Right.  But this is something being

quoted, something later on from the Court of Appeals decision.

The Minister of Justice never says in 2013 that he will not be

released until July 2015.  He says -- his sentence expires

then.  That's when he would be surrendered or -- or the end of

his sentence or otherwise, meaning I still have discretion.

The government, US government, never asked him apparently to

G4mecavc

1    exercise that discretion, never asked for him sooner.

2              THE COURT:  We talked about that before.  But the fact

3    of the matter -- I'll take a look at it.

4              Does the government have a copy of the order?

5              MR. IMPERATORE:  Well, it's not --

6              THE COURT:  I know it's quoted.  I got the part that

7    it's quoted.

8              Do you have a copy of the order?

9              MR. IMPERATORE:  I can look for it, your Honor.  I

10   don't know whether I have it, but I'd be happy to provide it.

11             THE COURT:  Okay.

12             MR. IMPERATORE:  And he did indicate the date, and he

13   did indicate that it was not apparent that an earlier

14   extradition request would have resulted in an earlier release,

15   which the government submits is dispositive of this issue.  And

16   not to belabor the point, your Honor.  I just want to clarify a

17   couple of other points.

18             First of all, the Court has a very thorough record

19   before it from the Canadian court -- this is at pages 10 and 25

20   of its opinion -- saying explicitly that, quote, Cavan has not

21   presented any evidence to suggest that the US authorities were

22   involved in the parole suspension or revocation proceedings in

23   Canada, other than to provide information.  And it goes on to

24   say that the parole board played an inquisitorial function and

25   explained it relies on various information.

G4mecavc

1          And then secondly, the Court had asked about the issue

2     of the stay.  The Canadian court, in finding that there was no

3     prejudice to Cavan, observed and highlighted that Cavan could

4     have sought review of his parole revocation and never did that.

5     He could have done that.  That was at his disposal.  He never

6     sought to challenge it.

7          THE COURT:  All right.  Mr. Levine, let me give you

8     the last word, if there's anything you wanted to say.

9          MR. LEVINE:  Just one thing, Judge, which is the part

10    quoted by the government, saying it's not apparent an earlier

11    request would have granted, I think actually favors my

12    position; because they're not saying that an earlier request

13    would have been futile.  And I think that's a very important

14    distinction.  They leave open the possibility an earlier

15    request would have been granted.  There is just at this point

16    no way to -- they were in a position to know whether it

17    actually would have happened, but they do acknowledge it could

18    have been and might have been, and that a request by the

19    government would not have been futile.

20          THE COURT:  Thank you.

21          MR. LEVINE:  I was just going to ask whether I can get

22    the minutes of this proceeding.

23          THE COURT:  Absolutely.  Submit proper vouchers and

24    that will be fine.

25          MR. LEVINE:  Thank you.

G4mecavc

1          THE COURT:  All right.  And let me hear the

2    government's application.

3          MR. IMPERATORE:  Your Honor, the government moves to

4    exclude time between today and June 24th to allow the parties

5    to file any supplemental submissions, for the Court to resolve

6    the motion and to allow the parties to discuss a potential

7    disposition.

8          THE COURT:  All right.  Mr. Levine, any objection?

9          MR. LEVINE:  No, your Honor.

10         THE COURT:  I find that the ends of justice will be

11   served by granting a continuance to June 24th, and that the

12   need for a continuance outweighs the best interests of the

13   public and the defendant in a speedy trial.  The reasons for my

14   finding are that the time is needed to enable the parties to

15   address the issues arising out of today's proceeding and to

16   accommodate Mr. Levine's trial schedule in another case.

17         And accordingly, the time between today and June 24th

18   is excluded under the Speedy Trial Act.

19         MR. IMPERATORE:  If I may, your Honor.  I just want to

20   inquire if there are any particular points that the Court would

21   like the parties to address in light of the proceedings today.

22         THE COURT:  Well, you'll have a transcript.  The Court

23   has focused everyone's attention on what its concerns are, and

24   I'm not requiring you to make a submission beyond.

25         I do require you to get me or make best efforts to get

G4mecavc

1    me the Canadian Minister of Justice determination, which I

2    would like to review in full or a copy of the original.  Beyond

3    that, you're free to submit nothing, if you choose to.

4              MR. IMPERATORE:  I understand, your Honor.  We will

5    make efforts to get the Court that opinion.

6              THE COURT:  Okay.  Thank you very much.  We're

7    adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25