UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       - v. -                    :                    09 Cr. 1120 (PKC)

HAN CAVAN,                    :

              Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING MEMORANDUM**


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Edward A. Imperatore
Assistant United States Attorney
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

         - v. -                                      :                    09 Cr. 1120 (PKC)

HAN CAVAN,                                   :

               Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government respectfully submits the following memorandum in connection with the sentencing of Han Cavan, which is scheduled for Tuesday, February 28, 2017 at 11:00 a.m.  For the reasons that follow, a sentence of imprisonment within the stipulated Guidelines range of 151 to 188 months would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

## I.  BACKGROUND

*Cavan's Prior Narcotics Conviction*

On November 20, 2006, Cavan, a Canadian citizen, was sentenced in the United States District Court for the District of Minnesota to 117 months' imprisonment for conspiring to distribute approximately 30,000 ecstasy pills, in violation of Title 21, United States Code, Section 846.  At the time of Cavan's conviction in Minnesota, he was residing and had business in the United States.  Cavan began serving his sentence at a prison in the United States.

*Cavan's Transfer to Canada and Parole*

On May 9, 2008, pursuant to the International Transfer of Offenders Act and accompanying treaty, Cavan was transferred from a United States prison to a Canadian prison on

June 26, 2008 to serve the remainder of the sentence imposed in Minnesota federal court.

Approximately six weeks after his return to Canada in 2008, Cavan was granted "accelerated day parole" under Canadian law, which permitted Cavan to reside at a Salvation Army residence in Kitchener, Canada while subject to various parole conditions.

***Cavan's Cocaine Distribution Conspiracy While on Parole***

Immediately after Cavan's release on parole, a confidential source ("CS") working with the DEA received phone calls from Cavan, who asked the CS to supply Cavan with kilogram quantities of cocaine.  The CS was the brother of a man whom Cavan had met in jail in the United States.  Following several conversations over the phone, in October 2008, Cavan told the CS that he would be sending a representative to New York City to meet with the CS to discuss the possibility of engaging in a narcotics transaction.  On October 11, 2008, the CS met with Jo Van Lo, Cavan's associate, in Brooklyn, New York.  During the meeting, the CS and Lo discussed the possibility of doing future cocaine transactions together.  (PSR ¶¶ 14-15).

Approximately one month later, Lo met with the CS in New York again at Cavan's direction.  During that meeting, on November 6, 2008, Lo and the CS discussed a cocaine transaction that the CS and Cavan had previously discussed over the telephone, involving the sale by the CS to Cavan of approximately 17 kilograms of cocaine for $27,000 per kilogram.  On November 9, 2008, Cavan engaged in a telephone conversation with the CS during which Cavan told the CS that he wanted Lo to inspect the 17-kilograms of cocaine in order to confirm the quality of the drugs.  Cavan further told the CS that he wanted Lo to inspect the drugs in the secret compartment in the vehicle before the transporter took the drugs to Canada.  Finally, Cavan informed the CS that the driver transporting the money from Canada to New York would be leaving Canada the following day.  (PSR ¶ 15).

On November 10, 2008, at Cavan's direction, Lo advised the CS that the money for the 17 kilograms of cocaine was en route from Canada to New York in a hidden compartment of a black Honda Pilot bearing Ontario license plates.  That night, Lo met with the CS in New York and provided the CS with a key to the Pilot.  Lo instructed the CS on how to retrieve the money from the hidden compartment within the Pilot and how to fill the hidden compartment in the Pilot with the 17 kilograms of cocaine that were to be transported to Cavan.  (PSR ¶ 16).

On November 10, 2008, CPB officials stopped Hicks in Buffalo, New York, at the Peace Bridge border crossing from Canada to the United States.  Hicks's car was searched and approximately $458,000 was found in a hidden compartment in the Pilot.  In response to questions from the first CBP officer, Hicks said that he was in possession of U.S. currency and that he was instructed to deliver the car with the currency in it to the parking lot of the address provided to him.  Once he arrived at his given destination, according to Hicks, an individual would use a key to remove the currency in the hidden compartment and then fill the compartment with narcotics.  Hicks further advised that he planned to drive the vehicle back to Canada after these individuals made the exchange. (PSR ¶ 17).

On November 12, 2008, the CS met with Lo at a restaurant in Brooklyn, New York. During the meeting, Lo told the CS that the individual transporting the money from Cavan for the 17 kilograms of cocaine had been stopped at the United States-Canada border and that law enforcement had seized the cash.  At the direction of Cavan, Lo assured the CS that the loss of the money would not affect their drug trafficking operations, and that those operations would continue.  (PSR ¶ 18).

***Cavan is Granted Accelerated Full Parole***

On October 2, 2009, the Parole Board of Canada, which, at that time, was unaware of

Cavan's cocaine distribution activity while on parole, granted Cavan "accelerated full parole."
Cavan was required to live at a designated address in Kitchener, Canada, and be supervised by a
particular Canadian parole office.

### Cavan Again Attempts to Purchase Distribution Quantities of Cocaine

Following the failed 17-kilogram transaction in November 2008, while Cavan was on
parole, Cavan continued to call the CS on the telephone to discuss the possibility of Cavan's
purchasing kilogram quantities of cocaine from the CS.

On October 6, 2009, four days after Cavan's release on full parole, Cavan advised the CS
that he was interested in buying ten kilograms of cocaine. Cavan indicated that he would pay the
CS $24,000 per kilogram. On October 14, 2009, Cavan further advised the CS that (i) two of his
associates would be coming to meet with the CS; (ii) he wanted to purchase ten kilograms of the
cocaine at $25,000 per kilogram (to which Cavan referred in the call as "pants"); (iii) his
associates would have the money to purchase the cocaine and, if the cocaine was of good quality,
they would take it all during the meeting; and (iv) he would purchase twenty kilograms of
cocaine on a future occasion.

The following week, Cavan informed the CS that "John" would be arriving in the New
York City area later that night and that "John" would contact the CS upon his arrival. Later that
night, Mawhinney called the CS and set up a meeting for the following day. The next day,
October 19, 2009, the CS met with Mawhinney in Brooklyn, New York, and discussed the ten-
kilogram cocaine transaction. In addition, Mawhinney told the CS that he was a good friend of
Cavan. Two days later, on October 21, 2009, the CS and Mawhinney met again in Brooklyn,
New York. During that meeting, the CS informed Mawhinney that the ten kilograms of cocaine
were not yet available. Mawhinney advised the CS that his associates were still interested in

purchasing the ten kilograms of cocaine from the CS for $25,000 per kilogram and that they could complete the transaction in Buffalo, New York at a later date.

On November 5, 2009, the CS and Mawhinney engaged in a telephone call during which (i) Mawhinney confirmed that he would pay $25,000 per kilogram of cocaine for ten kilograms of cocaine from the CS; (ii) the CS explained that he would travel to Buffalo to execute the transaction; and (iii) the CS and Mawhinney discussed the possibility of the CS selling additional kilograms of cocaine to Mawhinney and his associates.

On November 16, 2009, the CS and an undercover officer ("UC") met with Mawhinney in the UC's car in the parking lot of a restaurant in Tonawanda, New York, near Buffalo.  During the meeting, Mawhinney inspected one kilogram of cocaine and obtained a sample of the cocaine.   The following day, the CS met again with Mawhinney in Tonawanda, New York. Mawhinney led the CS to Mawhinney's car and showed the CS the duffle bag containing the money for the ten kilograms of cocaine.  Mawhinney was placed under arrest.

### *The Indictment*

On November 19, 2009, two days after Mawhinney was arrested, a grand jury in the Southern District of New York returned the Indictment against Cavan, Lo, Mawhinney, Hicks, and Adam Kaup (an associate of Cavan in Tonawanda), charging each of them with one count of distributing and possessing with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A).

### *Suspension and Revocation of Cavan's Parole*

Within one week of the return of the Indictment, a warrant suspending Cavan's parole was issued.  About two-and-a-half months after Cavan's parole was suspended, the Canadian parole board revoked his parole on two separate grounds: (1) Cavan was involved in the

commission of a new criminal offense, and (2) Cavan had breached a specific non-association condition of his parole.  Cavan was remanded to Canadian custody.

***Cavan's Extradition***

By diplomatic note, on September 14, 2012, the United States formally requested the extradition of Cavan, Lo, and Hicks to stand trial on the Indictment in the Southern District of New York.

On June 7, 2013, a Canadian Superior Court of Justice ordered Cavan's committal for surrender to United States authorities.  Cavan subsequently spent more than two years attempting unsuccessfully to challenge the surrender order so that he would not have to face charges in the United States.

On November 5, 2015, after Cavan's appeals of the surrender order were denied and exhausted, Cavan was extradited to the United States.

***Cavan's Guilty Plea and Sentencing Guidelines***

On October 4, 2016, Cavan pled guilty under Count One of the Indictment to conspiring to distribute 500 grams and more of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

As set forth in Cavan's plea agreement and presentence report, Cavan's total offense level is 32, which reflects an agreement to distribute at least 15 kilograms but less than 50 kilograms of cocaine and a three-level role enhancement for managerial role.  Cavan has five Criminal History points and is thus in Criminal History Category III based upon (1) Cavan's prior conviction in the District of Minnesota of conspiring to distribute narcotics and (2) Cavan's commission of the instant offense while serving a term of supervision following that conviction. Accordingly, at total offense level 32 and Criminal History Category III, Cavan's stipulated

Guidelines range is 151 to 188 months' imprisonment, with a mandatory minimum of five years' imprisonment.

## II. DISCUSSION

A sentence of imprisonment within the stipulated Guidelines range of 151 to 188 months is necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, provide just punishment, and protect the public from future crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2).

Cavan played a critical leadership role in a very large cocaine distribution conspiracy, which involved multiple participants and an agreement to move 27 kilograms of cocaine across the United States-Canada border for a total of approximately $708,000 in cash. At all times, Cavan was the driving force behind the transaction.  Cavan initiated the deal by contacting the CS, the brother of a narcotics dealer he had met in prison while serving his prior narcotics sentence.  Cavan negotiated the price and quantity of both cocaine transactions with the CS.  At his direction, his underlings – Lo and Hicks – traveled to New York to deal in person with the CS, deliver the cash, and take possession of the drugs.   After the cash was seized by CBP officers at the Canadian-American border, Cavan was undeterred.  He worked in earnest to negotiate a second cocaine deal and carry it out through Mawhinney.

There was nothing aberrational about Cavan's conduct.  Rather, Cavan's conduct was highly repetitive and calculated, involving multiple phone calls to negotiate two separate drug transactions and Cavan's deployment of his co-conspirators to carry out the transactions.  That Cavan was successful in negotiating the transactions from Canada reflects Cavan's leadership role, his access to huge quantities of cash, and the carefully orchestrated nature of Cavan's scheme.

A Guidelines sentence is also necessary to afford adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).   It is difficult to imagine a more compelling case for specific deterrence than Cavan's.  As noted above, Cavan was sentenced in the District of Minnesota to 117 months' imprisonment for committing a very serious federal narcotics offense – conspiring to distribute tens of thousands of ecstasy pills.  Nevertheless, Cavan was transferred to Canada and received an extraordinary windfall under Canadian law: release on parole after serving only a few months of his 117-month sentence.  Cavan was plainly emboldened by his release on parole.  Immediately after his release from prison in Canada, Cavan worked in earnest to continue to distribute narcotics in the United States by contacting the brother of a convicted drug felon he had met in prison in order to broker two huge cocaine transactions, which involved the international movement of multi-kilogram loads of cocaine and hundreds of thousands of dollars in cash.

That Cavan's prior drug conviction did not dissuade him from committing the instant drug offense immediately after his release on parole – and in fact seemed to encourage his criminal conduct – underscores the compelling need for a sentence within the Guidelines range to promote specific deterrence.  In fact, even after the first drug transaction failed when Hicks was arrested entering the United States, Cavan immediately resumed his criminal negotiations with the CS to orchestrate a second cocaine transaction through Mawhinney in 2009.  As the Probation Department correctly observed, "the defendant's criminal history demonstrates that the defendant is unable to live in any community-based setting without breaking the law.  The defendant has spent a great deal of his recent adult life incarcerated and has exhibited an inability or unwillingness to lead a law-abiding lifestyle."  (PSR at 18).

Although Cavan emphasizes in his sentencing submission that he was incarcerated in Canada since in or about December 2009 based upon his conduct in this case, Cavan overlooks that his incarceration in Canada was based on his violation of his parole, an entirely separate offense.  Cavan also ignores that he served a total of only 90 months in custody on his Minnesota conviction in both United States and Canadian prisons, which is 27 months less than the total 117-month prison sentence.  (PSR at 18).  Even if Cavan had received good-time credit and served 85 percent of that sentence, he would have served approximately 99 and one-half months, a term that would have ended in or about April 2016, after Cavan was extradited to the United States to face charges in this case.  Accordingly, even factoring in the time he served in both American and Canadian prisons following the imposition of the Minnesota sentence, Cavan still did not complete his full Minnesota term of imprisonment.  In these circumstances, it is apparent that Cavan's prior incarceration in the United States and Canada for approximately 90 months (PSR at 18) was effectively in satisfaction of a substantial portion – but not all – of the 117-month Minnesota sentence, not the sentence to be imposed in this case.  Cavan therefore should receive no credit for the time he served in Canada for his parole violation.[1]

Cavan's contention that the sentence imposed by the Court should be reduced to reflect time spent incarcerated in Canada for a parole violation is contrary to both the Guidelines and common sense.  Violation of parole or supervised release is an entirely separate offense from the offense underlying the violation.  *See* U.S.S.G. § 7B1.3(f) ("Any term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, *whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the*

---

[1] In any event, Cavan could not have been extradited to the United States until his appeals of his Canadian incarceration were exhausted, which did not occur until November 2015.

*revocation of probation or supervised release*.") (emphasis added); *see also United States* v. *Melendez*, 422 F. App'x 4, at *1 (2d Cir. 2011) ("A consecutive sentence is appropriate because a sentence for violation of supervised release is not intended to be a sanction for [the defendant's] conduct, but rather for the 'breach of trust' committed against the District Court.") (internal quotation marks omitted) (citing *United States* v. *Sweeney*, 90 F.3d 55, 57 (2d Cir.1996)).  While Cavan's prior incarceration is a relevant consideration under Section 3553(a), it certainly does not weigh in favor of a below-Guidelines sentence.  Instead, it underscores the need for a sentence within the Guidelines range in order to afford specific deterrence, promote respect for the law, and protect the public from future crimes of the defendant.

The need for general deterrence is also very compelling in this case.  A Guidelines sentence is necessary to deter high-level drug traffickers like Cavan from engaging in multi-kilogram drug transactions across United States borders.  It is important that the sentence imposed by the Court send the message that there is no tolerance for drug-dealing recidivism, which will result in a very substantial term of imprisonment.

With regard to relative culpability, the Government views Cavan as the most culpable member of the scheme, which involved a four participants other than Cavan:  Lo, Hicks, Mawhinney, and Kaup.  As noted above, it was Cavan, not his co-conspirators, who initiated the transaction and negotiated the price and quantity of the cocaine, and deployed co-conspirators to exchange the drugs for cash.  Previously, the Court sentenced Mawhinney to 76 months, Kaup to 70 months, and Hicks to 46 months.  (Lo has yet to be sentenced.)  Mawhinney, Kaup, Lo, and Hicks, all of whom were safety-valve eligible, were acting at Cavan's direction.

Cavan's argument that he is similarly situated to Mawhinney is entirely unavailing.  As an initial matter, Cavan, unlike Mawhinney, played a supervisory and managerial role in the

10

narcotics conspiracy.  Cavan plainly orchestrated both cocaine transactions.  Mawhinney, by contrast, played no role in the initial cocaine transaction that resulted in Hicks's arrest, which was negotiated entirely by Cavan.   It was Cavan, not Mawhinney, who initiated the second cocaine transaction with the CS.  As described above, it is apparent from the dialogue with the CS that Mawhinney met with the CS at Cavan's direction.  The fact that Cavan negotiated the deal by phone from Canada while Mawhinney was arrested attempting to carry out a hand-to-hand drug deal itself reflects that Cavan played a much higher role in the drug organization than did Mawhinney.  In an event, Mawhinney, unlike Cavan, was safety-valve eligible, had no criminal history, and did not commit the instant offense while under a term of supervision.  Accordingly, a Guidelines sentence for Cavan would not reflect any sentencing disparity with respect to Mawhinney or any other defendant.

### III.  CONCLUSION

For the foregoing reasons, the Government respectfully submits a sentence of imprisonment within the stipulated Guidelines range of 151 to 188 months would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated:  New York, New York
February 17, 2017

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:   _____/s/_____

Edward A. Imperatore
Assistant United States Attorney
(212) 637-2327

11