H2SSCAVS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          09 CR 1120 (PKC)

 5   HAN CAVAN,

 6                  Defendant.

 7   ------------------------------x

 8                                      New York, N.Y.
                                        February 28, 2017
 9                                      11:00 a.m.

10
     Before:
11
                     HON. P. KEVIN CASTEL,
12
                                        District Judge
13

14                      APPEARANCES

15   JOON H. KIM
          United States Attorney for the
16        Southern District of New York
     EDWARD IMPERATORE
17        Assistant United States Attorney

18   ARNOLD J. LEVINE
          Attorney for Defendant
19

20

21

22

23

24

25
```

H2SSCAVS

```
 1              (Case called)

 2              MR. IMPERATORE:  Good morning, your Honor.  Edward

 3    Imperatore for the government.

 4              THE COURT:  Good morning, Mr. Imperatore.

 5              MR. LEVINE:  Good afternoon, your Honor.  Arnold

 6    Levine for Mr. Cavan.

 7              THE COURT:  Good morning, Mr. Levine.

 8              Mr. Levine, the first thing I want to go through is

 9    the materials I have, and the question will be whether I have

10    everything I should have.  I have a presentence report,

11    recommendation and addendum revised by probation on

12    December 19, 2016; I have your letter dated February 15, 2017;

13    and I have the government's memorandum, which I received on

14    February 17.  I'm looking to see; yes, it bears the date of

15    February 17.

16              Do I have everything I should have on the subject of

17    sentencing?

18              MR. IMPERATORE:  Yes.

19              MR. LEVINE:  I believe so.

20              THE COURT:  Mr. Levine, has the defendant read,

21    reviewed and discussed with you the presentence report,

22    recommendation and addendum?

23              MR. LEVINE:  Yes.

24              THE COURT:  Does the defendant have any objections to

25    the facts set forth in the presentence report?
```

H2SSCAVS

1    MR. LEVINE:  No, your Honor.

2    THE COURT:  Does the defendant have any objections to

3    the guideline calculation set forth in the presentence report?

4    MR. LEVINE:  No, your Honor.

5    THE COURT:  Does the government have any objections to

6    the facts set forth in the presentence report?

7    MR. IMPERATORE:  It does not.

8    THE COURT:  Any objection to the guideline

9    calculation?

10   MR. IMPERATORE:  No, your Honor.

11   THE COURT:  I find and adopt as my findings of fact

12   the facts as set forth in the presentence report.  Further,

13   I find that the guidelines were correctly calculated, and the

14   defendant is at total offense category 32, criminal history

15   category III.

16   I will now give Mr. Levine the opportunity to speak on

17   behalf of the defendant.

18   MR. LEVINE:  Your Honor, as you know, I submitted the

19   sentencing memorandum.  I don't want to go through all of that

20   again.  However, having received the government's sentencing

21   memorandum, there were a few things I wanted to say about that.

22   THE COURT:  Please.

23   MR. LEVINE:  First, the government claims in the

24   sentencing memo at page eight that Mr. Cavan was "at least on

25   parole after serving only a few months of a 117-month

H2SSCAVS

 1    sentence."  That's just false.

 2           Mr. Cavan was detained in custody of BOP on his

 3    Minnesota case starting on March 2, 2006.  He was transferred

 4    to Canada in June of 2008.  He served all that time in BOP

 5    custody.  And then once he was in Canada, about six weeks

 6    following his transfer to Canada in June 2008, six weeks after

 7    that, that is when he was released on accelerated day parole.

 8    Only day parole, not full parole.  He still had to reside

 9    someplace because of their restrictions.  He actually served

10    two and a half years in custody on the Minnesota case before

11    being paroled by Canada, not a few months.

12           THE COURT:  The period of the sentence was 117 months,

13    was it?

14           MR. LEVINE:  Yes.

15           THE COURT:  He served about 24 and a half months of

16    the 117 months?

17           MR. LEVINE:  Before the accelerated day parole.  Then

18    after the violation of parole, the time he served on that,

19    about another six years or so once he was picked up for the

20    violation of parole that resulted directly from this

21    indictment.  That was credited against that sentence.

22           THE COURT:  Against the 117-month sentence?

23           MR. LEVINE:  Right.  So he ended up serving just about

24    all the time he would have served even if had been taken into

25    account the good time he would have gotten if he were here.

H2SSCAVS

1          On that note, I would also point out, Judge, the

2     United States Federal Sentencing Guidelines, the United States

3     Sentencing on drug cases is somewhat draconian.  It has been

4     acknowledged through by politicians and by almost everybody

5     else for years now.  In fact, the United States Sentencing

6     Guidelines for drug cases, unlike the drug cases for almost

7     all of other crimes in the guidelines, were not based on the

8     empirical studies and research of past sentences.  The Supreme

9     Court acknowledged that in <u>Kimbrough</u> and <u>Rita</u> and other cases,

10    and therefore the sentences that are given out under the

11    guidelines in here were not entitled, or are not entitled to,

12    I think, as greater weight.  Certainly there is a lot more

13    freedom or reason to depart from the guidelines -- I don't want

14    to use depart in terms of depart --

15          THE COURT:  Vary.

16          MR. LEVINE:   -- vary from the guidelines, yes, your

17    Honor -- on drug cases because of how the guidelines came about

18    in the first place for those charges.

19          I think that the 117 months on that in the first place

20    may have been somewhat extreme.  Most of the world, most of the

21    civilized world doesn't sentence nonviolent drug offenders to

22    sentences like that than what they get here.  I wouldn't

23    necessarily say serving two and a half years in prison is

24    necessarily a windfall, nevertheless, he ended up serving

25    another six or seven after that, so he did end up serving about

1   nine years or so on that, and now he's been in, also.

2          Also on page eight of the government's sentencing

3   memoranda, the government claimed that Mr. Cavan worked in

4   earnest and continued to distribute narcotics in the United

5   States.  I have seen no evidence from what I have received that

6   any of these drugs were going to be distributed in the United

7   States.  All of the people involved in this conspiracy were

8   from Canada, negotiated from Canada, came into the United

9   States to pick up, with money, to get drugs to bring them back

10  to Canada.  I haven't seen anything.  I have not received any

11  discovery of any sort that said that anything was going to be

12  distributed in the United States.  As far as I know, everything

13  was bound for Canada.  In fact, the deal at all the meetings,

14  when there was going to be a meeting for the exchange of money

15  for drugs, was right over the Canadian border in Tonawanda, in

16  Buffalo, to be taken back to Canada.

17          On page nine, the government again talks about the

18  parole violation being "a separate offense."  I think they

19  continue to labor under the misunderstanding of what the parole

20  system is, and perhaps it is because the federal system doesn't

21  have a parole system anymore.  But the parole system in Canada,

22  just like it is in New York State, is that it is not a separate

23  offense.  It is not an offense at all.  You are on a parole,

24  you have a violation, you violate the parole, you go back in on

25  the original sentence.  Itself is not a new crime.  You don't

H2SSCAVS

get charged in state court, criminal court, Canadian court, for

a violation of parole.  That is not something that must be

proved beyond a reasonable doubt.  It is not a separate

offense.  It does not have its own sentencing guidelines or

sentencing parameters by statute.  You go back in for a

violation of the parole.  It was not a separate offense.

        Also, I think that the way the government phrases it,

in referring to it as a separate offense and making it sound

like he wasn't serving time there based on this conduct, flies

in the face of the plea agreement.  Where on page three it says

the government agrees that the defendant's incarceration in

Canada for parole violation prior to his extradition to the

United States, based on the conduct charged in the indictment,

is a relevant consideration pursuant to Title 18, United States

Code, Section 3553(a).  There is no question that conduct to

which he is charged here is what resulted in his

re-incarceration in Canada.  He was out.  He was at liberty in

Canada.

        THE COURT:  Now you lost me.  I was with you until

that moment.  Let's back it up and let me tell you what my

understanding is, and then you can tell me where I've gotten it

wrong.

        A United States District Court sentenced the defendant

on November 20, 2006, to 117 months' imprisonment and three

years' supervised release.  He was transferred to Canada in

H2SSCAVS

1    June of '08.  He got day parole about six weeks later and full

2    parole on October 2, 2009.  While he was on parole from the

3    original conviction from the District of Minnesota, he engaged

4    in the offense conduct, at least part of the offense conduct,

5    charged here.  This resulted in his indictment in this case for

6    which he is going to be sentenced today.  It also happened that

7    it had a different consequence, and that consequence was the

8    Canadian authorities revoked his parole and he continued to

9    serve his 117-month sentence.  As you pointed out and I

10   understood, he wound up serving nearly all of that 117 months

11   because of the revocation of the parole.  That's what I

12   understand the facts to be.

13             MR. LEVINE:  Those are the facts, Judge.

14             THE COURT:  I thought I understood you to be

15   suggesting that he was being punished by Canadian authorities

16   for the same offense conduct here that he is being sentenced

17   for today.

18             MR. LEVINE:  Well, Judge, he really was because --

19             THE COURT:  Then that's an entirely different

20   argument.  Now you've gone in a different direction,

21   Mr. Levine.  That is where I lose you.

22             MR. LEVINE:  I don't think I have, Judge.  Let me

23   explain.

24             THE COURT:  If he was never indicted in this case, the

25   Canadian authorities could have elected to revoke his parole

H2SSCAVS

1    based on the offense conduct here, right?

2               MR. LEVINE:  They could have.  They didn't.  It was

3    only after the United States notified them of the indictment in

4    the Southern District that they revoked his parole.

5               THE COURT:  Right.

6               MR. LEVINE:  The only basis for the revocation of

7    parole was this indictment and the conduct that gave rise to

8    it.

9               THE COURT:  That is no different, in my mind, unless

10   you can tell me otherwise why if someone is serving a sentence,

11   say a 117-month sentence, and they violate the terms of their

12   supervised release, the court can remand them for their

13   violation of the terms of their supervised release.

14              It may have been the same act, it might have been a

15   murder in the course of a drug conspiracy, a single pull of a

16   trigger that caused the violation of supervised release, but

17   that has nothing whatsoever to do with the charging of a

18   separate crime for that murder in the course of the drug

19   conspiracy for which the defendant is answerable.  That's a

20   separate punishment.

21              MR. LEVINE:  Judge, I am not making a double jeopardy

22   argument.

23              THE COURT:  I know you're not making a double jeopardy

24   argument, because I know you, Mr. Levine.  If you were making a

25   double jeopardy argument, I would hear it and I would read it.

H2SSCAVS

1    I have no doubt about that.

2              MR. LEVINE:  Right.

3              THE COURT:  What I hear you trying to say is that, my

4    goodness, your Honor, the Canadians punished him for this.  And

5    that argument has about as much weight as saying to the judge

6    in two cases in this court, nevermind international, that a

7    violation of supervised release punished the defendant for the

8    underlying crime or the punishment he received for the

9    underlying crime takes care of the violation of supervised

10   release.  Because, after all, it was one bullet fired from one

11   gun on one day at one person, and therefore the punishment for

12   the murder in the course of drug trafficking takes care of the

13   violation of supervised release.  It doesn't.  Those are two

14   separate matters.

15             MR. LEVINE:  Well, Judge, I think that the law does

16   allow you to consider it and take into account in terms of the

17   sentencing on either of them.

18             THE COURT:  3553(a) gives me a lot of discretion.

19             MR. LEVINE:  Exactly.

20             THE COURT:  I understand that.

21             MR. LEVINE:  The sentencing guidelines that the

22   government cites regarding in the case of a violation of

23   supervised release having to be consecutive, that is a

24   guideline, that is not by statute.  Congress never set forth

25   that rule.

H2SSCAVS

```
 1                THE COURT:  OK.  I understand that argument.  I can
 2     give defendant time served today, correct?
 3                MR. LEVINE:  You would have to give him a minimum of
 4     five years, Judge.  That is the statutory minimum.
 5                THE COURT:  All right.  Give him five years then.
 6                MR. LEVINE:  That is what I am asking you to do.
 7                THE COURT:  Great.  But I can give him anything that
 8     doesn't violate the statute, right?
 9                MR. LEVINE:  Yes.
10                THE COURT:  I understand that.
11                MR. LEVINE:  Right.
12                THE COURT:  That part I understand.  Go ahead.
13                MR. LEVINE:  What I am saying, Judge, is that in terms
14     of the equities of it, he was out of jail in Canada and he was
15     put in --
16                THE COURT:  Under sentence.  He may have been out of
17     jail.  He was under sentence.
18                MR. LEVINE:  Yes, Judge.  There is no question --
19                THE COURT:  He was serving his sentence, and you can't
20     have it both ways either.  You can't say, oh, my goodness, he
21     was serving his sentence in Canada.
22                Was he serving his sentence while he was on parole?
23                MR. LEVINE:  He was serving sentence while he was on
24     parole.
25                THE COURT:  OK.
```

H2SSCAVS

1              MR. LEVINE:  Yes, Judge.  There is no question this

2     was a but-for cause of his re-incarceration there.

3              THE COURT:  The point of that is what?

4              MR. LEVINE:  The point is that, in that sense, the

5     parole violation was taken into account as punishment for this.

6     This, if he didn't have an indictment in the Southern District,

7     he wouldn't have been re-incarcerated.  If it was a different

8     sort of violation, he might have been given 30 days on the

9     parole violation and by the parole department and released, as

10    they do here, sort of a rote and restore, 90 days --

11             THE COURT:  Not that it is a dispositive factor here,

12    not that it is dispositive because it certainly isn't, but as I

13    heard you say, and I think you confirmed to me already, that of

14    the 117 months he served, when we take into account the time on

15    the revocation of parole in Canada, he served nearly all of

16    that 117 months, correct?

17             MR. LEVINE:  If you take into account the good time

18    that would have come off the 117 months.

19             THE COURT:  OK.

20             MR. LEVINE:  He would have served a 117-month sentence

21    if he were here.

22             THE COURT:  All right.

23             MR. LEVINE:  Yes.  So moving on then, Judge, I think

24    you get my point that you have discretion.

25             THE COURT:  I have lots of discretion.

H2SSCAVS

1          MR. LEVINE:  I'm asking you to exercise the discretion

2     and taking into account the equities and to give him some

3     credit for some, if not all, of the time that he had to serve

4     on the parole violation that resulted from the same conduct,

5     and that the government concedes resulted from the same conduct

6     in the plea agreement.

7          Also, Judge, Mr. Mawhinney was charged as a

8     codefendant of Mr. Cavan, and Mr. Mawhinney received a sentence

9     of 76 months, I believe.  I know Mr. Mawhinney didn't have a

10    prior conviction and that makes him different than Mr. Cavan.

11    However, Mr. Mawhinney's role in this was at least equal to

12    what Mr. Cavan's was, despite what the government says.  I have

13    a minimum of five transcripts where Mr. Mawhinney is

14    negotiating by himself on the phone with the confidential

15    source.  Mr. Mawhinney made the trip to New York, not at

16    Mr. Cavan's direction.  Mr. Cavan wasn't his boss.

17         Mr. Cavan wasn't allowed to come to New York.  He

18    wouldn't have been allowed to cross the border because of his

19    prior conviction.  Mr. Mawhinney could.  Mr. Mawhinney, in

20    fact, showed up for meetings with the confidential source, and

21    he brought his boss with him.  And that's clear from one of the

22    recordings, that there is somebody with him who is clearly his

23    boss and who explains about being there and having to be there

24    and is losing money simply by being there because of how much

25    drugs he sells and where he sells it.  It is not Mr. Cavan.

H2SSCAVS

```
1            So Mr. Mawhinney either has a boss that is above
2   Mr. Cavan that he is dealing with directly, or Mr. Mawhinney is
3   actually negotiating other deals by himself that doesn't even
4   involve Mr. Cavan.  But in any case, then Mr. Mawhinney is at
5   least as culpable and at least as equal as Mr. Cavan in this
6   conspiracy.  He received a sentence of 76 months.  I don't
7   think that the fact that Mr. Cavan has the prior conviction
8   should result in him getting ten more years than Mr. Mawhinney,
9   which is what would fall within the guideline range.
10           THE COURT:  Well, let me ask you.  Did Mr. Mawhinney
11  get a leadership role enhancement?
12           MR. LEVINE:  He did not, but that is up to the
13  government to reach with him or not.
14           THE COURT:  No, it's not.  That is absolutely not
15  true, Mr. Levine.  That is not true.  It's not up to the
16  government to decide whether he gets a leadership enhancement.
17  Where did you get that from?
18           MR. LEVINE:  Judge, they had a plea agreement and they
19  made their determination in there about what they agreed to,
20  and the government is the one that provides the facts in the
21  case to the probation department.
22           THE COURT:  Yes.
23           MR. LEVINE:  So it is based on that.
24           Ultimately, Judge, yes, it is your determination.  It
25  is your determination based on what the government says and
```

H2SSCAVS

1    what the government sets forth in the plea agreement with the

2    defendant and what they tell probation.

3          THE COURT:  No.  What probation tells me, and there

4    have been times when the government has not sought an

5    enhancement which I thought was appropriate in a case, or has

6    not given a downward adjustment which I thought was appropriate

7    in the case.  In fact, in some of those, they have been based

8    on the recommendation of the Office of Probation who has looked

9    at facts and said, That is not right, this enhancement should

10   be given or not.

11         But the point is, the government doesn't control.

12   What I have here is a guideline calculation that the parties to

13   the case before me have accepted and which has a leadership

14   role enhancement.  To talk about another defendant's sentencing

15   and mention the difference in criminal history, but not mention

16   that one had a leadership role enhancement and the other

17   didn't, is not optimum.

18         Anyway, we have that straightened out now.  Go ahead.

19         MR. LEVINE:  My point is, Mr. Mawhinney should have

20   been receiving that based upon the information that I have, the

21   transcripts I have of Mr. Mawhinney's showing, Mr. Mawhinney's

22   role in everything, his participation in it.  And what I see,

23   what I have been provided by the government, it seems to me

24   that Mr. Mawhinney should have been provided and should have

25   been given it.

H2SSCAVS

1          THE COURT:  That he was a manager or supervisor of

2     five or more participants, or his role was otherwise extensive?

3          MR. LEVINE:  Yes.

4          THE COURT:  All right.  Go ahead.

5          MR. LEVINE:  Of course, 3553 requires that the point

6     is, you should be taking into account, of course, what other

7     codefendants got in the same conduct in the same.

8          THE COURT:  I have an obligation to avoid unwarranted

9     sentencing disparities.

10          MR. LEVINE:  Yes, which is why I am making my point

11     about Mr. Mawhinney.

12          THE COURT:  I understand.

13          MR. LEVINE:  Your Honor, those are my issues with the

14     government's sentencing memorandum.

15          Your Honor, certainly given that there was an offer

16     made in this case, Mr. Cavan was allowed to plead guilty to the

17     lesser count, the (b)(1)(B), reducing his minimum from ten to

18     five.  Of course that gives your Honor tremendous discretion

19     along with it then to sentence him below the ten years, which

20     I think is really the basis for doing it.

21          It is not that the government couldn't prove the

22     (b)(1)(A).  In fact, the guideline range takes into account the

23     (b)(1)(A), the (b)(1)(A) amount of drugs.  The point was to

24     give your Honor that discretion.  I am asking your Honor on

25     behalf of Mr. Cavan to exercise that discretion, to sentence

H2SSCAVS

1      Mr. Cavan to a period of five years, taking into account

2      everything in my sentencing memorandum and what I have said

3      today.

4                  THE COURT:  Thank you, Mr. Levine.

5                  Mr. Cavan, this is your opportunity to address the

6      court directly, to bring to my attention any facts or

7      circumstances that you believe I should take account of in

8      passing sentence upon you.  If there is anything you wish to

9      say, this is the time to say it.

10                 THE DEFENDANT:  I feel bad for what happened, what I

11     did wrong.  It was a bad decision for me, and my family went

12     through a hard time with me all these years, past ten years.

13     And I am asking you for forgiveness, your Honor.

14                 THE COURT:  Thank you, Mr. Cavan.

15                 This is the government's opportunity to speak.

16                 MR. IMPERATORE:  Your Honor, it's very difficult to

17     imagine a more compelling case for specific deterrence than

18     this case.  This is a defendant who knew exactly what happens

19     in U.S. courts, which he is caught in possession or attempting

20     to distribute huge quantities of drugs in the United States.

21     He got a substantial sentence in Minnesota.  Through that

22     process, he undoubtedly learned how mandatory minimums work,

23     how the sentencing guidelines work, and exactly what would

24     happen if he were caught again trying to distribute drugs

25     through or from the United States.

H2SSCAVS

1          When he was transferred to Canada, he received this

2     huge windfall that is not available under U.S. law, this early

3     release on parole after serving only a small portion of his

4     sentence.  And what is the first thing he did when he got out

5     on parole?  He tries to set up this drug deal.  And not only

6     that, his connection for the drug deal is the brother of an

7     individual he was incarcerated with in Minnesota.

8          In so doing, he showed tremendous disrespect for the

9     U.S. court system, for the law of this country.  And the Court

10    should bear in mind here, your Honor, there are two separate

11    drug deals at issue.  The first is this drug deal --

12          THE COURT:  I understand.  This is before Hicks was

13    caught at the border and after Hicks was caught at the border.

14          MR. IMPERATORE:  Right.  The point, your Honor, even

15    after Hicks was caught at the border, he didn't stop.  He kept

16    trying to negotiate another drug deal that he carried out

17    through Mawhinney.  So even the fact that he was on parole and

18    had been stopped the first time around didn't deter him from

19    engaging in yet another multi-kilo load of cocaine.

20          All of that shows, your Honor, that probation has it

21    right in their sentencing recommendation when they say this is

22    a defendant who is unable to live in a community-based setting

23    without breaking the law.  They point out correctly that this

24    is someone who spent essentially his entire adult life breaking

25    the law.  Even though he was arrested in Minnesota in 2006, he

H2SSCAVS

hadn't even been employed for the previous nine years, which suggests that he may have been earning his living by engaging in criminal conduct.

There is a truly compelling need for this court to sentence him to a guidelines term in order to deter him and other individuals who try to exploit the drug trade in the United States for their personal gain.  It is an aggravating factor that he tried to do that from Canada while outside the jurisdiction of the United States.

Mr. Levine's argument boils down to a claim that the court should somehow discount the time he served in Canada on the parole violation when imposing the sentence in this case. I don't really understand the argument.  The defense seems to want to have it both ways.  They concede that when Mr. Cavan went in in Canada, he was going back in on the original sentence.  That is true.  In fact, while he came close to satisfying the original Minnesota term of imprisonment, he didn't actually complete it.  As pointed out on page 18 of the presentence report, through July 2015, he served 90 months of that 117-month sentence.  So even with good time credit, he would have served approximately 110 months.  That is still seven months short of the total Minnesota term.

The result that the defendant wants here is contrary to common sense and the guidelines, as the court highlighted in its questions.  Under the guidelines, when someone goes back in

H2SSCAVS

1    for a violation of supervised release, that time is supposed to

2    run consecutively under the guidelines.  That is Section 71.3.

3         Finally, your Honor, this argument about comparing the

4    defendant to John Mawhinney is really frivolous.  For one

5    thing, John Mawhinney was not involved in the first cocaine

6    deal at all with Hicks being stopped at the border.  Both of

7    these transactions were set up by Cavan.  Cavan was the one

8    negotiating from Canada.  That shows his leadership role.

9         Mawhinney, by contrast, was caught and arrested in a

10   hand-to-hand drug transaction in New York.  So the fact that

11   Cavan is in Canada on the phone negotiating, and here is this

12   defendant, Mawhinney, being arrested doing a hand-to-hand shows

13   that Cavan is clearly in a leadership role with respect to

14   Mawhinney.  A leader like Cavan doesn't get caught in a

15   hand-to-hand drug transaction.

16        For all those reasons, your Honor, we submit that a

17   guideline sentence is necessary, and we urge the court to

18   impose one, to send a message that when you are caught as a

19   repeat offender, particularly someone in a leadership role,

20   there is going to be a price to pay at sentencing.

21        THE COURT:  This is the court's statement of reasons

22   for the sentence to be imposed on Han Cavan.

23        In sentencing Mr. Cavan, I have considered all of the

24   materials that I referenced at the outset.  I have considered

25   the thoughtful and lively interchange with Mr. Levine, which

H2SSCAVS

1  was most appropriate, and he lived up to his obligations as an

2  effective and zealous advocate; I have considered the very

3  brief statement of Mr. Cavan, which I found to be sincere; and

4  I have considered the helpful statements of Mr. Imperatore.  I

5  have considered all of the factors under 3553(a).  I need not

6  recount all that I have considered, but I have considered it

7  all.

8          In terms of the nature and characteristics of the

9  offense, the defendant entered a plea of guilty of

10  participating in a conspiracy to distribute five kilograms and

11  more of cocaine.  With regard to the offense conduct, there is

12  no dispute here that the amount of cocaine to be distributed in

13  this conspiracy, had it been successful, was between 15 and

14  50 kilograms of cocaine.  There is also no dispute and an

15  agreement that the defendant was a manager or supervisor and

16  the criminal activities involved five or more participants or

17  was otherwise extensive.

18          The history related to Mr. Cavan's prior criminal

19  conviction is relevant because of the timeline.  He was

20  sentenced on November 20, 2006, to 117 months' imprisonment,

21  three years' supervised release, in an MDA possession with

22  intent to distribute case.  And the defendant admitted to his

23  involvement and stated that he had agreed to transport ectasy

24  pills from Canada to the United States, and was held

25  responsible for 29,807 pills.

H2SSCAVS

1          Pursuant to a treaty on the International Transfer of

2     Offenders Act, he was transported to a Canadian prison to serve

3     most of his sentence.  He was transferred June 26, 2008.  It

4     was then that he began to negotiate the purchase of kilogram

5     quantities of cocaine and sent a person to New York City to

6     meet with a confidential source.

7          A month later, his associate, Jo Van Lo, met with the

8     confidential course and they discussed a transaction involving

9     approximately 17 kilograms of cocaine, and Cavan indicated that

10    he wanted Lo to inspect the drugs and to confirm their quality,

11    and that a driver would be transporting money from Canada to

12    New York, leaving the next day.  And the confidential source

13    was advised that the money would be in a hidden compartment in

14    a block Honda compartment with Ontario license plates.

15         Lo met with the source in New York and provided a key

16    to the pilot with instructions on how to retrieve the money.

17    The money was intercepted at the Canadian border.  The car was

18    searched and approximately $458,000 was found in a hidden

19    compartment in the automobile.

20         One might think that this might put an end to matters,

21    but it didn't.  Lo met with the confidential source and told

22    him about the interception of the money and assured that the

23    drug trafficking would continue later.  And there was a

24    discussion that in October 2009, in which Cavan advised the

25    confidential source that he was interested in buying ten kilos

H2SSCAVS

```
1    of cocaine, and that Cavan would pay 24,000 per kilogram and

2    that two of his sources would be coming to meet with the

3    confidential source.  Codefendant Mawhinney was arrested in

4    connection with that transaction.  Cavan, Mawhinney, Hicks, the

5    person with the car seized at the border, and Adam Kaup, were

6    all indicted by an indictment returned by the grand jury in

7    this district.

8            Like many defendants who appear in this court,

9    Mr. Cavan did not have an easy life.  He is one of seven

10   children and his family is spread out, at least one member

11   living in France and another in Lagos.  Some he is in contact

12   with, some he's not.  He left Lagos at age six and went to

13   Thailand, and ultimately his family settled in Ontario,

14   supported by a church group.  He moved from Owen Sound to the

15   larger town of Kitchener in 1999.

16           He has had a history of use of controlled

17   substances -- methamphetamine, powdered cocaine, marijuana --

18   and as noted, he has a sparse employment record since 2003.  I

19   have considered the need to impose just punishment.  Where the

20   cocaine was bound for is not particularly significant.  It

21   destroys lives, and there was utter indifference on the part of

22   Mr. Cavan and others working with him as to where that cocaine

23   wound up and how lives would be affected by its use.

24           International drug trafficking is difficult to detect

25   and there is need to deter others from engaging in that sort of
```

H2SSCAVS

1    conduct.  Mr. Cavan was caught in connection with the District

2    of Minnesota case.  He understood what the penalties were under

3    U.S. law for drug trafficking.  He was shown generosity and

4    kindness with the willingness of U.S. authorities to transfer

5    him pursuant to treaty and statute to serve his time in Canada.

6    The Canadian authorities were similarly generous in letting him

7    out on day parole in Kitchener.  We know how he responded to

8    that.  We know the respect that he showed for law.  We know how

9    he was deterred by the sentence he received in a federal court.

10          There is a need to protect the public from further

11   crimes of this defendant.  Also a need to avoid unwarranted

12   sentence disparities among persons convicted of similar crimes.

13   The punishment that Mr. Cavan received for his District of

14   Minnesota case is separate from and will run consecutive to the

15   sentence in this case.  He owes apparently more time on that

16   sentence.

17          The court will recommend to the Bureau of Prisons and

18   the Department of Justice that he not be transferred to Canada

19   pursuant to treaty or statute, and that he serve out his prison

20   term in a U.S. facility.  I would never dream of making that

21   sort of a recommendation but for what happened here in this

22   case when he was transferred.

23          I have considered the sentencing guidelines, policy

24   statements, and official commentary of the United States

25   Sentencing Commission.  I have considered them in an advisory

H2SSCAVS

1    manner and recognize that I am not obligated to sentence within

2    the guidelines.  I recognize that I have variance discretion.

3    I also recognize that the defendant is 48 years of age.

4              Based upon all the surrounding circumstances, I intend

5    to sentence the defendant to 120 months' imprisonment, five

6    years' supervised release, waive the fine based on limited

7    assets and limited earnings ability, impose forfeiture, and

8    impose a mandatory special assessment of $100.  The following

9    is sufficient but not greater than necessary to achieve the

10   purposes of Section 3553(a) in my view.

11             Does the defendant or his counsel have any objection

12   to the court's proposed sentence or the statement of reasons

13   for that sentence?

14             MR. LEVINE:  One issue is I don't think he owes any

15   time on the previous sentence anymore.

16             THE COURT:  That may be the case, but that is a matter

17   for the Bureau of Prisons too.  But the point that I make here

18   is, and the judgment will recite, that it is consecutive to any

19   time that he may owe on that judgment.  He may owe no time on

20   that judgment, but that is a matter for the Bureau of Prisons

21   to calculate.

22             MR. LEVINE:  Can I have just one second?

23             (Pause)

24             Judge, the only objections I have are in the nature of

25   the arguments that I made before.  You heard the argument.  No

H2SSCAVS

1    legal objections to it.  Mr. Cavan has asked if it would be

2    possible for you to recommend that BOP place him in Georgia, if

3    possible.

4              THE COURT:  Reason?

5              THE DEFENDANT:  I get better weather.

6              THE COURT:  I am going to leave that to the Bureau of

7    Prisons.

8              Let me hear from the government.  Any objection to the

9    court's proposed sentence or statement of reasons for that

10   sentence?

11             MR. IMPERATORE:  No objection.

12             THE COURT:  The defendant will please stand and I'll

13   impose sentence.

14             Han Cavan, it is the judgment of this court that

15   you're hereby remanded to the custody of the United States

16   Bureau of Prisons to be imprisoned for 120 months, consecutive

17   to any discharge portion of the sentence imposed by the

18   District of Minnesota in 06 CR 92.  It is recommended to the

19   Bureau of Prisons and the Department of Justice that you not be

20   considered eligible for transfer to serve any portion of this

21   sentence outside the United States.

22             Following release from imprisonment, you shall be

23   placed on supervised release for five years with the following

24   terms and conditions:  You shall not commit another federal,

25   state or local crime, nor illegally possess a controlled

H2SSCAVS

1    substance, nor possess a firearm or destructive device.  You

2    shall cooperate in the collection of DNA as directed by

3    probation.  The mandatory drug-testing condition is suspended

4    due to imposition of a special condition requiring drug

5    treatment and testing.

6            The standard conditions of supervision 1 through 13

7    are imposed with the following special conditions:  You shall

8    submit your person, residence, place of business, vehicle, and

9    any other property or electronic devices under your control to

10   a search on the basis that the probation officer has reasonable

11   suspicion that contraband or evidence of a violation of the

12   conditions of release may be found.  The search must be

13   conducted at a reasonable time and in a reasonable manner.

14   Failure to submit to a search may be grounds for revocation.

15   You shall inform other residents that the premises may be

16   subject to search pursuant to this condition.  You shall

17   participate in an outpatient treatment program approved by

18   probation, which program may include testing to determine

19   whether you have reverted to using drugs or alcohol.  You shall

20   contribute to the cost of services based on an ability to pay

21   and the availability of third-party payments.  The court

22   authorizes the release of available drug treatment evaluations

23   and reports to the substance abuse treatment provider.

24           You shall obey the immigration laws of the United

25   States and comply with the directives of immigration

H2SSCAVS

1    authorities.  You shall report to the nearest probation office

2    within 72 hours of release from custody.  It is further ordered

3    that you shall pay the United States a special assessment of

4    $100, which shall be due immediately.

5            You shall forfeit all right, title, and interest to

6    all real and personal property which was used in connection

7    with the crime or was the proceeds of the crime or derived from

8    the crime.

9            Mr. Cavan, you have the right to appeal the sentence I

10   have imposed.  If you cannot afford the cost of an appeal, you

11   may apply for leave to appeal as a poor person.  The time

12   limits for filing the notice of appeal are brief and they are

13   strictly enforced.  If you request, the Clerk of Court will

14   prepare and file a notice of appeal on your behalf immediately.

15           Do you understand all that?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Please be seated.

18           Anything further from the government?

19           MR. IMPERATORE:  No, your Honor.

20           THE COURT:  Anything further from the defendant?

21           MR. LEVINE:  No, your Honor.

22           THE COURT:  Mr. Cavan, it would be my hope that I

23   could leave you with something of an optimistic or hopeful

24   message.  It is awfully tough to do.  You are going to have to

25   figure out how to have meaning to the time that you spend

H2SSCAVS

1   either in learning skills that you can apply when you return

2   home or making amends to people in your family and friends who

3   have been hurt by all of this.  I certainly wish you and your

4   family the very best.

5           We are adjourned.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25